945 So.2d 553 (2006)
FLORIDIANS AGAINST EXPANDED GAMBLING, The Humane Society of the United States, and Grey2k USA, Inc., Appellants,
v.
FLORIDIANS FOR A LEVEL PLAYING FIELD; Glenda E. Hood, in her official capacity as Secretary of State; The Department of State, Brenda C. Snipes, in her official capacity as the Supervisor of Elections of Broward County; John Stafford, in his official capacity as the Supervisor of Elections of Duval County; Bonnie M. Jones, in her official capacity as the Supervisor of Elections of Escambia County; Peggy Rae Border, in her official capacity as the Supervisor of Elections of Flagler County; Buddy Johnson, in his official capacity as the Supervisor of Elections of Hillsborough County; Ion Sancho, in his official capacity as the Supervisor of Elections of Leon County; Constance Kaplan, in her official capacity as the Supervisor of Elections of Miami-Dade County; Vicki P. Cannon, in her official capacity as the Supervisor of Elections of Nassau County; Patricia Hollarn, in her official capacity as *554 the Supervisor of Elections of Okaloosa County; Bill Cowles, in his official capacity as the Supervisor of Elections of Orange County; Kurt Browning, in his official capacity as the Supervisor of Elections for Pasco County; Theresa Leporte, in her official capacity as the Supervisor of Elections of Palm Beach County; Deborah Clark, in her official capacity as the Supervisor of Elections of Pinellas County; P. Douglas Wilkes, in his official capacity as the Supervisor of Elections of Santa Rosa County; Penny L. Halyburton, in her official capacity as the Supervisor of Elections of St. Johns County; and Deanie Lowe, in her official capacity as the Supervisor of Elections of Volusia County, Appellees.
No. 1D05-0575.
District Court of Appeal of Florida, First District.
November 30, 2006.
*555 John H. Pelzer of Ruden, McClosky, Smith, Schuster & Russell, P.A., Ft. Lauderdale; Mark Herron, Thomas M. Findley, and Robert J. Telfer, III, of Messer, Caparello & Self, P.A., Tallahassee; and Scott H. Marder, Ft. Lauderdale, for Appellants.
Wilbur E. Brewton and Tana D. Storey of Roetzel & Andress, L.P.A., Tallahassee; Jack M. Skelding, Jr., of Skelding & Cox. P.A., Tallahassee; Ronald L. Book of Ronald L. Book, P.A., Aventura; Marc W. Dunbar of Pennington Moore Wilkinson Bell & Dunbar, P.A., Tallahassee; and Harold F.X. Purnell and Gary R. Rutledge of Rutledge, Ecenia, et al., Tallahassee; Charlie Crist, Attorney General, James A. Peters, Special Counsel, Steven Todd Gold, Deputy Solicitor General, of Office of the Attorney General, Tallahassee, for Appellees.
PER CURIAM.
Appellants challenge the legality of placing on the 2004 ballot the proposed constitutional amendment which "Authorizes Miami-Dade and Broward County Voters *556 to Approve Slot Machines in Parimutuel Facility" (the Slots Initiative). The Slots Initiative was approved in the November 2, 2004, general election. See Art. X, § 23, Fla. Const. Appellants claimed the Slots Initiative petition did not satisfy the requirements of Article XI, section 3 of the Florida Constitution because paid petition gatherers committed fraud to obtain signatures, and the names and addresses of the paid petition gatherers were not included, in violation of section 100.371, Florida Statutes, as amended by Chapter 97-13, section 22, Laws of Florida.
The trial court entered final summary judgment, concluding any improper signature gathering was cured by the general election, and recognizing its earlier partial summary judgment refusing to declare the petitions statutorily invalid because the names and addresses of the paid petition gatherers were not included. The trial court distinguished allegations of fraud on the basis that the acts predated the general election and did not relate to the ballot summary. We affirm the trial court's ruling that Florida law does not mandate the invalidation of signature petition forms which do not include the name and address of the paid petition gatherers. See Dockery v. Hood, 922 So.2d 258 (Fla. 1st DCA 2006). However, we agree with Appellants that final summary judgment was entered in error on the claim that the petitions failed to comply with Article XI, section 3 of the Florida Constitution.
In determining whether the trial court reversibly erred in granting final summary judgment on Florida constitutional grounds, we are confronted with two questions, each of which is based upon Appellants' factual assertions, which are presumed to be true for purposes of final summary judgment.[1] First, is a failure to comply with mandatory constitutional prerequisites automatically cured, as a matter of law, once an election is held, when a lawsuit challenging compliance is brought prior to the election? Second, is a party who seeks to amend the Florida Constitution and those employed by that party exempt, as a matter of law, from actual compliance with mandatory constitutional prerequisites for amending the Constitution if they create the illusion of compliance through fraudulent activities, and the amendment is subsequently approved by the voters?[2] We answer both questions in the negative.
We reverse on these independent, alternative grounds and remand for a trial to determine whether Appellees failed to obtain the constitutionally required signatures for submission to the voters. If the trial court determines such failure occurred, and no other remaining defenses apply, the trial court should declare the Slots Initiative invalid.

I. BACKGROUND

For citizen initiatives, the Florida Constitution mandates that, prior to placing a proposed constitutional amendment on the *557 ballot, the proponent must obtain signed petitions from registered voters equaling 8% of the total ballots cast in the last presidential election statewide and 8% of the voters in at least half of the congressional districts. Art. XI, § 3, Fla. Const.
Appellants alleged Floridians for a Level Playing Field (FLPF), the party sponsoring the Slots Initiative, employed a political consulting group to gather the constitutionally required signed petitions. The petition gatherers were paid up to $6.50 per signed petition. Instead of obtaining actual signatures, the paid collectors committed fraud by forging signatures and fabricating names on a large number of the initiative petitions. Appellants alleged that thousands of Slots Initiative petitions were procured by fraud. FLPF then used the fraudulently signed petitions to deceive the various Supervisors of Elections, and ultimately, the voters, to create the illusion that it had obtained the constitutionally required number and geographic dispersal of signed petitions.
Approximately 20% of the submitted petitions came from Broward County. To check the authenticity of the signatures on those petitions, Appellants obtained a computerized database of the names and addresses of each voter who purportedly signed a petition for the Slots Initiative from the Broward County Supervisor of Elections. Appellants used this database to conduct statistical analyses, telephone number matching, and follow-up interviews.
The results of Appellants' investigation revealed over one-third of the individuals contacted who were identified as signing a petition unequivocally stated they did not sign a petition for the Slots Initiative. Some of the signatories were deceased at the time they allegedly signed their petitions.
Appellants argue their evidence shows that approximately 57% of the petitions contained the name of fictitious persons or forged signatures of actual voters. From their investigation in Broward County alone, Appellants argued they could show FLPF knowingly failed to collect the constitutionally mandated number and dispersal of valid signatures, and only through fraud was FLPF able to create the illusion that it had complied with the mandatory constitutional prerequisites.
Appellants filed their complaint, and their motion for emergency expedited hearing and permanent injunction before the November 2, 2004, election. On October 11, 2004, the circuit court heard Appellants' motion for emergency expedited hearing and injunctive relief. By order dated October 19, 2004, the circuit court ruled that "the matters presented are serious, warrant discovery and record development, but are not suitable for expedited final hearing before the November 2, 2004, election." A few weeks after the election, on January 6, 2005, the circuit court granted final summary judgment on the basis that the general election cured any failure by Appellees to obtain the constitutionally required number of petition signatures, even though Appellees and their agents engaged in fraudulent conduct. The circuit court also concluded that, absent constitutional infirmities, the doctrine of separation of powers dictated courts should not interfere with the method used by the Supervisors of Elections to verify signatures.[3]

*558 II. NO CURE BECAUSE LEGAL CHALLENGE PRIOR TO ELECTION

In Pearson v. Taylor, 159 Fla. 775, 32 So.2d 826 (1947), the Florida Supreme Court emphasized that there is a difference between cases where a failure to follow procedures has been challenged before the election and those where the challenge is not brought until after the election:
The aggrieved party cannot await the outcome of the election and then assail preceding deficiencies which he might have complained of to the proper authorities before the election. See Payne v. Hodgson, 34 Utah 269, 97 P. 132. It is possible that the opinion in Tacker v. Board of Com'rs. of Polk County, 126 Fla. 15, 127 Fla. 248, 170 So. 458, persuaded the lower court to its conclusion because there we said, in effect, that the filing of a petition signed by the required numbers of signers was a precedent to any legal election. This statement, like all enunciations of law, must be considered in the light of the factual case before us. There we were dealing with the question raised prior to the election which is not the case here. We have recognized the difference hence it is not necessary to look to other jurisdictions. We have said that the constitution places a mandatory duty on the legislature to follow certain procedure as a necessary prerequisite to bringing about an election to amend the constitution, however, more than once we have said, in substance, that the neglect to follow such procedure was fatal if raised before the election, yet the defect was cured by the election itself. See State ex rel. Landis v. Thompson, 120 Fla. 860, 163 So. 270; Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892; West v. State of Florida, 50 Fla. 154, 39 So. 412; Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963, Ann. Cas. 1914B, 916.
Id. at 827 (emphasis added). Unlike the facts in Pearson, the challenge by Appellants was brought prior to the election. Accordingly, accepting Appellants' assertions as true that an insufficient number of signatures were obtained, the "neglect to follow such [constitutionally required] procedure was fatal" because the challenge was "raised before the election." Id.
In Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963 (1912), the validity of a constitutional amendment proposed by the Florida Legislature was at issue because of an alleged failure of the Legislature to obtain the requisite number of votes. Id. In ruling that the constitutionally required vote of the legislature on the proposed amendment is a vital element to the amendment's adoption, the Florida Supreme Court stated:
The Constitution mandatorily requires, as an essential prerequisite to the publication and submission of a proposed amendment to the Constitution, that it shall "be agreed to by three-fifths of all the members elected to each House" of the Legislature, thus making the specified legislative action not an immaterial technical form, but a vital element in the adoption of constitutional amendments, from which it would follow *559 that, if a proposed amendment is adopted before it has been duly agreed to by the Legislature, it does not become a valid part of the existing Constitution. Therefore, the public welfare demands that the questions here raised as to the validity of the proposal of such amendments should be determined as speedily as the law will permit so as to avoid unnecessary expense, confusion, and litigation in governmental matters that vitally affect all the people of the state. It is the duty of the courts to facilitate and not to retard the determination of litigated causes.

Id. at 966 (emphasis added). Here, Appellants brought their action and sought relief before the election, but were denied an expedited trial. This denial by the trial court was in error according to the requirement of a speedy resolution as stated in Crawford. It was wrong for the trial court to rule that a trial would not occur before the election because discovery was needed for these "serious" matters, and then enter judgment against Appellants on the basis that, because the election had been held, it cured the minor, technical defects that may have occurred. These inconsistent rulings do not comply with the dictates of Crawford to facilitate rather than retard the determination of litigated causes.
If a proposed amendment is published, submitted to a vote of the people, and adopted "without any question having been raised prior to the election as to the method by which the amendment gets before them, . . . a favorable vote by the people" will "cure defects in the form of the submission."[4]Armstrong v. Harris, 773 So.2d 7, 18-19 (Fla.2000) (quoting Sylvester v. Tindall, 154 Fla. 663, 669, 18 So.2d 892, 895 (1944)) (emphasis added). Thus, based on Armstrong, a subsequent election can act as a cure only when a challenge has not been raised prior to the election and the challenge involves only a defect in the form of the submission.
Here, before the proposed amendment was placed on the ballot, Appellants challenged the method by which the amendment would be placed before the voters by challenging the authenticity of the submitted petitions and alleging the mandatory constitutional prerequisites for placing the amendment on the ballot were not legally met. Based upon the above cited language from Armstrong and Sylvester, since the defect was challenged before the election, it could not be cured by the election.

III. NO CURE FOR SIGNIFICANT FRAUD

However, even if the proposed amendment had not been timely challenged, a favorable popular vote, standing alone, does not confer automatic validity to a defective constitutional amendment. See Armstrong, 773 So.2d at 18. It is clear that a favorable popular vote cannot cure deception. As Armstrong held, "[a] proposed amendment cannot fly under false colors." Id. at 16. Although Armstrong used this metaphor to represent the constitutional requirement that the true effect of a constitutional amendment must be accurately summarized for the voters, it is equally applicable where a party uses fraud to create the illusion of compliance with mandatory constitutional provisions.
*560 An election cures only minor, technical defects in the form of the submission of the proposed amendment. See id. at 18. In this case, we do not address allegations of innocent but minor and technical errors by initiative proponents. For example, a proponent could in good faith fail to collect an adequate number of signatures, and a state official could in good faith erroneously certify the number as sufficient under law. Another such example could occur where proponents or state officials could fail to publish the proposed initiative in a newspaper of general circulation during the precise designated weeks required by Article XI, section 5 of the Florida Constitution. We need not determine here whether such good-faith errors would be considered cured by an election under Armstrong, and other relevant law. Here, we address a very different issue: whether an election cures fraud purposely designed to thwart the constitutional requirements that a proposed initiative must demonstrate sufficient public support before voters decide whether to revise the state's organic law.
It is well settled that the people of the state have a right to amend their Constitution, and "to require proposed amendments to be agreed to and submitted for adoption in the manner prescribed by the existing Constitution." Crawford, 59 So. at 967-68. The Constitution imposes mandatory requirements that apply across-the-board to all constitutional amendments. Armstrong, 773 So.2d at 14. "Every word of a state Constitution should be given its intended meaning and effect, and essential provisions of a Constitution are to be regarded as mandatory." Crawford, 59 So. at 968. A determination of whether an amendment to the Constitution has been validly proposed "depends upon the fact of substantial compliance or noncompliance with the mandatory provisions of the existing Constitution as to how such amendments shall be proposed." Armstrong, 773 So.2d at 14 (quoting Crawford, 59 So. at 966).
Essential constitutional prerequisites to the publication and submission of a proposed amendment to the Constitution are not immaterial, technical forms, but vital elements in the adoption of constitutional amendments. See Crawford, 59 So. at 966. Without compliance with the mandatory constitutional prerequisites, an adopted amendment "does not become a valid part of the existing Constitution." Id.
The provisions of article XI, section 3, regarding the total number of required petitions seeking placement on the ballot, and the geographic dispersal of those petitions, are essential provisions. See Art. XI, § 3, Fla. Const. Consequently, compliance is mandatory. See Crawford, 59 So. at 966 (noting the constitutional requirement that a proposed constitutional amendment "be agreed to by three-fifths of all members elected to each House" was an essential, mandatory prerequisite for a valid proposed constitutional amendment). As stated by the Florida Supreme Court:

The people of the state have a right to amend their Constitution, and they also have a right to require proposed amendments to be agreed to and submitted for adoption in the manner prescribed by the existing Constitution, which is the fundamental law. If essential mandatory provisions of the organic law are ignored in amending the Constitution of the state, and vital elements of a valid amendment are omitted, it violates the right of all the people of the state to government regulated by law. It is the duty of the courts in authorized proceedings to give effect to the existing Constitution. The proposal of amendments to the Constitution is a highly *561 important function of government that should be performed with the greatest certainty, efficiency, care, and deliberation.

Id. at 967-68 (emphasis added).
Appellants assert that substantial fraud occurred in the petition gathering process, and that the fraud caused there to be an insufficient number and distribution of valid signatures on the petitions. These assertions are not minor, technical defects. We do not comment on whether Appellants may be able to prove their assertions at trial because it is not before us. But fraud is substantial, and not minor, to the extent that, but for the fraudulent actions, the constitutional amendment would not have been presented to the public in the general election.[5] Accordingly, the general election did not operate to cure the fraud. See City of Naples v. Conboy, 182 So.2d 412, 417 (Fla.1965) (stating that "it is a salutary principle of law, which runs through all its branches, that fraud vitiates and annuls everything which it touches"); Yost v. Rieve Enterprises, Inc., 461 So.2d 178, 184 (Fla. 1st DCA 1984) (stating that "[i]t is a fundamental principle of equity that no one shall be permitted to profit from his own fraud or wrongdoing").[6]
If a cure operated in these circumstances, then there would be no recourse for citizen initiative amendments turned over to a rogue organization to gather the required number of signatures "for a price" without concern over whether it obtained valid signatures on the petitions. Nothing would stand in the way of the Florida Constitution's required process being ignored and hijacked through fraud to reach a desired outcome. As stated by the Court in Crawford, the process by which we amend our Constitution matters and is a "highly important function of government that should be performed with the greatest certainty, efficiency, care, and deliberation." 59 So. at 968 (emphasis added). "Deception of the voting public is intolerable and should not be countenanced." Armstrong, 773 So.2d at 20 (emphasis in original). Accordingly, there is no room in the process for fraud that places an amendment on the ballot.

CONCLUSION
For purposes of summary judgment, FLPF admits it presented petitions that contained forged and fictitious names to fraudulently create the illusion that it had complied with the mandatory constitutional prerequisites. Consequently, FLPF did not legally comply with the mandatory constitutional prerequisites. The use of substantial fraud to circumvent mandatory constitutional prerequisites is not the equivalent of a "mere formal or procedural irregularit[y]." Thompson, 163 So. at 276. Accordingly, Appellants' assertions of fraud do not constitute a minor, technical *562 defect in the form of the submission of a proposed amendment.
We reverse the final summary judgment to the extent it was entered on Appellants' claim that the petitions failed to comply with Article XI, section 3 of the Florida Constitution and on separation of powers. We remand for a trial to determine whether Appellees failed to obtain the constitutionally required signatures for submission to the voters. If the trial court determines such failure occurred, and no remaining defenses apply, the trial court should declare the Slots Initiative invalid.
We find that this case presents two questions of great public importance, which we hereby certify to the Supreme Court of Florida as such in accordance with Article V, section 3(b)(4) of the Florida Constitution and Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v):
I. WHETHER VALIDATIONS OF SIGNATURES BY SUPERVISORS OF ELECTIONS CAN BE CHALLENGED BASED UPON ALLEGATIONS OF FRAUD AFTER CERTIFICATIONS OF SIGNATURES HAVE BEEN ACCEPTED BY THE SECRETARY OF STATE AND THE BALLOT PRINTED AND ABSENTEE VOTING COMMENCED IN ACCORD WITH FLORIDA LAW?
II. WHETHER AN AMENDMENT TO THE FLORIDA CONSTITUTION THAT IS APPROVED BY VOTE OF THE ELECTORS MAY BE SUBSEQUENTLY INVALIDATED IF, IN AN ACTION FILED BEFORE THE ELECTION, THERE IS A SHOWING MADE AFTER THE ELECTION THAT NECESSARY SIGNATURES ON THE PETITION PROPOSING THE AMENDMENT WERE FRAUDULENTLY OBTAINED?
BROWNING, C.J., WEBSTER, and LEWIS, JJ., concur.
BENTON, J., concurs in the judgment.
KAHN, J., concurs in part and dissents in part with written opinion in which ERVIN and WOLF, JJ., concur.
PADOVANO, J., concurs in part and dissents in part with written opinion in which BARFIELD, DAVIS, POLSTON, and HAWKES, JJ., concur.
KAHN, J., concurring in part and dissenting in part.
I concur with the decision of the en banc court to certify questions to the Florida Supreme Court. I must respectfully disagree, however, with both the approach and the result reached by the majority as to the merits. One could scarcely overstate the significance of the majority decision which, in my view, will stand completely alone in the body of Florida jurisprudence. Contrary to the views expressed in a separate opinion, the important issue in this case has, in fact, been decided. In terms of the public importance, it is virtually immaterial whether appellants prevail on the merits. The majority opinion decides that the challenge may be brought, and is not barred by decades of supreme court precedent.
Bush v. Holmes stands in no way analogous to the present case. See Bush v. Holmes, 767 So.2d 668 (Fla. 1st DCA 2000) (Holmes) (remanding to trial court), appeal after remand, 886 So.2d 340 (Fla. 1st DCA 2004), and disapproved of by, 919 So.2d 392 (Fla.2006). In Holmes, challengers to the Governor's voucher program initially prevailed in the trial court based upon article IX, section 1, of the Florida Constitution. See id. at 670. The trial *563 court never reached the alternative and unrelated argument under the "no-aid" provision of article I, section 3, of the Florida Constitution. See id. at 677. The initial appeal, a plenary appeal of a final judgment in favor of the voucher opponents, resulted in a reversal in this court on article IX, section 1, grounds. See id. at 673-77. We remanded the case for trial solely on the article I, section 3, grounds. See id. at 677. In Holmes, no question existed as to whether the challengers had a right to contest the voucher program that had been enacted statutorily by our Legislature. Everyone conceded they had such a right, and the issue was only whether they would succeed on one or both of their theories. By contrast, in the present case, the issue is whether the challengers may overcome the fact that proponents of the slot machine initiative prevailed in the general election. This issue, however, is not merely a preliminary issue; it is the controlling issue. Even if the opponents lose at trial, they will have still established the principle that a court challenge, and perhaps one that lasts for years, may succeed after popular approval of an amendment by the electorate. This issue, and not the validity of the amendment itself, forms the basis of our certified questions.
The facts as alleged in the complaint lead us to accept as true that paid petition gatherers utilized both forged signatures and fabricated names on a large number of initiative petitions. These allegations of fraud and fabrication, however, really have little or nothing to do with the analysis of the central issue in this case. The argument posed by the appellant organizations centers upon their belief that they will be able to prove that a number of signatures on the initiative petitions were not actually put there by the alleged signatories. The allegation of fraud, although spicy, adds nothing to the mix as demonstrated by the following exchange during oral argument in this case:
J. Kahn: Are you saying that there is a difference when the opponents of the ballot initiative allege fraudulent collection of signatures and the situation on the other hand where everyone agrees after the election that there just weren't enough signatures. Is there a difference in those two?
Mr. Pelzer: [Attorney for appellants] In the latter instance where it simply  we miscounted say for example 
J. Kahn: We miscounted by, let's say extreme case, one signature took us under the eight percent in one congressional district.
Mr. Pelzer: That would be a violation of the constitution, that would be a fundamental violation.
J. Kahn: So, what I am trying to get to here is the fraud, as dramatic as it sounds, really is not the heart of the case. The heart of the case is that they don't have enough signatures.

Mr. Pelzer: I would say that's correct, Your Honor, that simply not having enough signatures for whatever reason 
J. Kahn: If we can set this case aside, we can set aside any initiative if someone can come up  before, during, or after the fact  assuming laches doesn't apply, and demonstrate that there was one signature too few in one congressional district.
Mr. Pelzer: That's correct, Your Honor, because the constitution 
J. Kahn: I appreciate your frankness. I just 
Mr. Pelzer: In this case, we talk about going to the heart of the election process and the allegations that are made here, certainly the fraud does go to the heart of that process because 

*564 J. Kahn: I want to be sure we are on the same page. Fraud is very dramatic. All of us are very impressed by these allegations. . . . But the same argument could be made absent fraud if they just didn't have the signatures and the supervisor in one county mistakenly or dishonestly, or however, just certified it because she happened to like the proposition.

Mr. Pelzer: You're correct, it's an a fortiori type of argument.

J. Kahn: You would go back and void this because the initiative was never properly before the electorate in either hypothetical.

Mr. Pelzer: That's correct, Your Honor, it simply failed to meet the minimum requirements of the constitution for whatever reason.

But, again, and the reason why it goes to the heart of the election again, regardless of whether it is fraud or a slipped finger on the calculator is because it shouldn't be on the ballot in the first place. If it shouldn't be on the ballot in the first place, then it has to go to the heart of the election process.
(emphasis added).[*] As appellants have readily admitted that the true issue in this case is whether a mistake or defect in the petition-gathering process may be cured by a subsequent election, that is the issue I choose to analyze.
My colleagues conclude that our analysis should be guided by Armstrong v. Harris, 773 So.2d 7 (Fla.2000). I disagree with that assertion for reasons I will address shortly. Instead, I suggest that this case is controlled by Pearson v. Taylor, 159 Fla. 775, 32 So.2d 826 (1947). In Pearson, our supreme court considered a local option election prohibiting the sale of liquor in Lafayette County. Id. According to the agreed statement of facts, the petition submitted to the board of county commissioners "contained less than 25% of the qualified electors" required by the controlling statute. Id. at 827. The trial court determined that, lacking the appropriate number of signatures, the county commission had no jurisdiction to call the election, and accordingly the trial court voided the result. Id.
On review, the supreme court carefully distinguished between those acts preliminary to the election and the election itself: "The duties required to be done leading up to the election, while in many respects may be mandatory, are in no respect a part of the election." Id. Accordingly, the court concluded that although neglect to follow the mandatory procedure may have been fatal if raised before the election, "the defect was cured by the election itself." Id. This holding should inform resolution of the present case.
Here, the question posed by the slot machine initiative duly went before Florida voters in the 2004 general election. Of great significance, appellants have raised no defect in the form of the ballot initiative, nor the descriptive language required by the constitution. The absence of any defect in the ballot language leads to a conclusion that the Pearson decision controls. Such absence should also persuade us that Armstrong is not germane. An examination of the Armstrong decision and its rationale confirms this.
In Armstrong, the supreme court considered, after the election, whether violation of Florida's statutory accuracy requirement for constitutional provisions would be cured by a subsequent election. *565 773 So.2d at 18-21. The accuracy requirement, codified as section 101.161(1), Florida Statutes (1997), provided the fulcrum for the Armstrong decision. See id. at 12. Initially, the court determined that it had jurisdiction to review whether a legislatively proposed amendment met the statutory accuracy requirement, including an explanatory statement of the chief purpose of the proposed measure. Id. at 14.
Next, the court considered the substantive question of whether the proposal at issue in the case, one having to do with Florida's definition of "cruel or unusual punishment," was, in fact, unfaithful to the statutory requirement. Id. at 16. Quite significantly, the supreme court, in conducting that particular analysis, relied entirely upon Wadhams v. Board of County Commissioners, 567 So.2d 414 (Fla.1990). Armstrong, 773 So.2d at 21. In Wadhams, the court had applied section 101.161(1) to an amendment by referendum of the Sarasota County Charter. 567 So.2d at 416. A majority of the Wadhams court concluded that the ballot language misled electors as to the permissible frequency of meetings of the Charter Review Board in Sarasota County. Id. Accordingly, the court determined that the ballot language "`is deceptive, because although it contains an absolutely true statement, it omits to state a material fact necessary in order to make the statement made not misleading.'" Id. (quoting Askew v. Firestone, 421 So.2d 151, 158 (Fla.1982) (Ehrlich, J., concurring)).
Wadhams, then, stands for the proposition that fallacious ballot language may be challenged and may be challenged after the election. We know this because the Armstrong court, characterized Wadhams as having rejected an argument that the voters' subsequent approval of the charter amendment "cleansed it of any defect." 773 So.2d at 20. Again, however, the Wadhams court acted because "the ballot did not adequately inform the electorate of the purpose and effect of the measure upon which they were casting their votes." Wadhams, 567 So.2d at 417. Building on this, the court concluded that the vote of the electorate might well have been different "if the voting public had been given the whole truth, as mandated by the statute." Id.
The Armstrong court expressly adopted the Wadhams holding and stated that "a favorable popular vote standing alone does not confer automatic validity on a defective amendment." Armstrong, 773 So.2d at 21. The Armstrong court concluded, as had the Wadhams court, that "the popular vote was based not on the whole truth but on part-truth." Id.
Nothing of the kind can be said of the slot machine amendment election because no allegations of any sort are raised against the amendment itself, its language, or its ballot summary. The sole allegation here concerns the defective, even fraudulent, gathering of petition signatures. This case, then, is controlled by Pearson and not Armstrong.
My learned colleagues posit that the election does not cure the slot machine initiative because, in their view, Florida law provides that only technical or minor defects may be so cured. Their view is mostly correct, but it does not resolve the present case. "Defect," as used in the supreme court cases, refers to a deficiency in the ballot language itself. See Armstrong, 773 So.2d at 21 ("When a defect goes to the very heart of the amendment, as it did in both Wadhams and the present case, it is impossible to say with any certainty what the vote of the electorate would have been `if the voting public had been given the whole truth.'" (quoting Wadhams, 567 So.2d at 417)). The defect argument is a red herring here because no *566 defect in the amendment language itself has been, or could be, raised.
In a long line of cases before Pearson, the supreme court established the rules in cases of irregularity in the procedure by which the proposed amendment came to be placed upon the ballot. See State ex rel. Landis v. Thompson, 120 Fla. 860, 163 So. 270 (1935); Collier v. Gray, 116 Fla. 845, 157 So. 40 (1934); West v. State, 50 Fla. 154, 39 So. 412 (1905). In Landis, the pronouncement of the supreme court left no doubt:
[A] majority of the court are of the opinion that even if some required form of procedure, in either of the particulars complained of by the respondent in this case, was in fact omitted or affirmatively disregarded by the Legislature of 1933 in submitting additional section 45 of article 5 of the State Constitution as a proposal to amend the fundamental law, that after the same has been duly advertised and the notices thereof required by section 1 of article 17, constitutionally published, and the people by a majority of their votes cast thereon at the 1934 General Election have approved the constitutional change made by section 45 of article 5 as a valid part of the Constitution, that the validity of said added section 45 of article 5 as a part of the organic law of this state is no longer open to question. . . .
163 So. at 276 (emphasis added).
My colleagues rely upon Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963 (1912), but that case is inapposite to the present controversy. In Crawford, a circuit judge enjoined the Secretary of State from publishing "as duly proposed amendments to the Constitution of the state, certain propositions that were considered in House Joint Resolution No. 222 . . . and also restrain[ed] the Secretary of State from furnishing such matter to the county commissioners of the several counties of the state to be posted at the polling places and placed on the official ballots." Id. at 966. The circuit judge granted the injunction based on a finding that fewer than the constitutionally required three-fifths of the House and the Senate approved the proposed amendment. Id. The supreme court agreed with the circuit judge that the proposed amendment had not been duly approved by the Legislature and thus declined to grant the supersedeas sought by the governor, as appellant, in order to avoid the effect of the injunction. Id. at 970. The case, as important as it may be in its discussion of the prerequisites of amending the constitution, instructs us not at all on the question of whether a majority vote of the electorate at the general election cures an alleged defect in submission.
Actually, Crawford does not conflict with the view later expressed by the supreme court in Landis and Pearson, and the law that I believe controls the present outcome. Under Pearson, the election cured the defect in petition gathering. In Landis, the election cured legislative disregard of mandated procedure. In Crawford, the supreme court, although considering the validity of the proposed amendments, in actuality dealt directly with only the question of whether supersedeas should be granted in order to stay the effect of the lower court's injunction. With the injunction stayed, the election could have proceeded. The supreme court recognized that it must resolve the matter before the election: "As the granting or denial of a supersedeas will virtually dispose of the merits of the cause, and the public being vitally interested, the merits will be considered on this application for supersedeas; questions of law only being involved." Crawford, 59 So. at 966. I would suggest that the supreme court recognized that *567 were supersedeas to be granted, and if the matter proceeded to a public election with the electorate approving the proposed amendments, resolution of the question discussed in the Crawford opinion would then be beyond the reach of the supreme court. The same is true with the present case.
The majority recognize that the case law they cite will apply only if the actions complained of against appellees somehow misled or defrauded the electorate. Accordingly, the majority opinion finds, "but for the fraudulent actions, the constitutional amendment would not have been presented to the public in the general election." Op. at 561. The majority then quotes Armstrong in arguing that, had the voting public been given the whole truth, the outcome of the election may have been different. Id. at n. 6. The majority's conclusion that the procedure by which the initiative made it onto the ballot may have misled or defrauded the electorate requires a conclusive presumption that voters do not mark "yes" or "no" based upon their views about the merits of the initiative. Rather, the majority presumes the voters rest securely upon an assurance that eight percent of the registered voters have signed petitions, including eight percent of the voters in at least half of the congressional districts as required by article XI, section 3, of the Florida Constitution. I cannot indulge this presumption and, moreover, such presumption, as the basis for setting aside an election, has been rejected by Pearson.
I respectfully dissent and would affirm the judgment of the circuit court. I concur as to the certified questions.
PADOVANO, J., concurring in part and dissenting in part.
I join in the decision and opinion on the issue presented by this appeal but respectfully dissent from the court's decision to certify questions for review by the Florida Supreme Court. Our decision to reverse the summary judgment in favor of the defendants and to remand the case for trial is merely an intermediate step in the litigation; it does not resolve the controversy between the parties, nor does it finally decide the issue that is said to be a question of great public importance. For these reasons, I believe that certification is premature.
Article V, section 3(b)(4), of the Florida Constitution provides that the supreme court may review "any decision of a district court of appeal that passes upon a question certified by it to be of great public importance." This grant of discretionary jurisdiction is not triggered by the question, but rather by the decision the district court has made in a case that turns on the resolution of the question. See Pirelli Armstrong Tire Corp. v. Jensen, 777 So.2d 973 (Fla.2001); Salgat v. State, 652 So.2d 815 (Fla.1995); Boler v. State, 678 So.2d 319 (Fla.1996); Gee v. Seidman & Seidman, 653 So.2d 384 (Fla.1995). In my view, the decision in the present appeal fails to meet this standard. Although this court has resolved a preliminary issue of law, it has not yet decided the case.
This court has not decided that the constitutional amendment at issue is invalid. To the contrary, the effect of the decision is merely to reopen the case for a trial on the merits. We do not know what facts will be proven on remand to the trial court or how the point of law we have addressed will be applied to the facts. It appears to me that the effect of the decision we have made in this case is merely to reject a ground for dismissal of the plaintiff's claim. All we have said so far is that the passage of the amendment does not render the plaintiff's claim of fraud moot as a matter of law. With respect for my colleagues *568 in the majority, I do not think that this is the kind of decision the framers of our Constitution were referring to in Article V, section 3(b)(4). It seems more likely to me that this provision was meant to apply to a final decision by a district court of appeal; that is a decision that passes upon a question of great public importance in the context of a full record after the completion of the proceedings in the trial court.
The present version of Article V, section 3(b)(4), was approved by the voters in 1980 as a part of series of reforms that were designed to reduce the caseload of the Florida Supreme Court. See Jenkins v. State, 385 So.2d 1356 (Fla.1980).[7] Although the district courts of appeal were supposed to be courts of final appellate jurisdiction in most cases, see Ansin v. Thurston, 101 So.2d 808 (Fla.1958), they had become, in the view of some judges and lawyers, no more than "way stations" along the route to the supreme court.[8] With the advent of the 1980 revision of Article V, the jurisdiction of the supreme court was sharply limited. The effect of the revision was to reduce the supreme court's caseload and to ensure the decisions of the district courts of appeal would be final in all but the most exceptional cases.
One jurisdictional change that is significant in the present case is that the 1980 revision of Article V eliminated the supreme court's authority to review interlocutory orders. Under the previous provision, the court had the power to review, by certiorari, an interlocutory order of a trial court in a case in which the final order would be directly appealable to the supreme court. See Art. V, § 3(b)(3), Fla. Const. (1972). The change in 1980 eliminated the entire class of interlocutory orders from the supreme court's jurisdiction, and it also reduced the possibility that the supreme court would spend its time in the preliminary stages of a case that might not ultimately require the supreme court's attention.
The decision of the court in this case is similar in a practical sense to an interlocutory order by a trial court. The effect of the decision is to restore the case to the position it would have been in had the trial court denied the defendant's motion for summary judgment. If the trial court had denied the motion in the first instance the case would be going to trial on the plaintiff's theory that the election did not render moot the claim of fraud, just as it is now. The order denying the motion for summary judgment would not be reviewable by any court, much less the Florida Supreme Court. I see no reason why the result should be different if the motion for summary judgment has been denied, as it was here, at the direction of an appellate court. In either case, the trial court decision is yet to be made and the need for further appellate review is yet to be determined.
It is certainly possible that the supreme court will have no need to review this case once it has been finally decided in the lower courts. The plaintiffs might not prove that the defendants committed a *569 fraud, and, even if they are able to prove that certain actions by the defendants amounted to fraud, they may not be able to prove that those actions were material. Suppose, for example, there was a fraud affecting some signatures but there are still enough legitimate signatures apart from the fraud to place the initiative on the ballot. Other possibilities exist, as well. The case might be decided on a procedural ground. For all we know, it might even be settled. If any of these events come to pass, our pronouncement on the law will take on the character of an abstract statement about the kind of conduct that might invalidate another constitutional amendment in the future.
Although the supreme court has not written on the point I have made here, the court has, in fact, declined to address important constitutional questions when they have been decided in a district court decision that does not resolve all of the issues in the trial court. The recent case of Bush v. Holmes, 919 So.2d 392 (Fla.2006), is a prime example of this practice. There, the issue that became the focus of the supreme court's decision and opinion was one that had been decided six years earlier in the first of two decisions by this court. The supreme court had an opportunity to address this issue when it was decided in the first case, but declined to accept the case for review. A brief recitation of the history of Bush v. Holmes, reveals the parallel to the present case.
The trial court held that the statute creating the Opportunity Scholarship Program was unconstitutional on the ground that it violated the guarantee in Article IX, section 1, of a uniform system of free public education. The plaintiffs had challenged the statute on other grounds, but the trial judge concluded that his ruling made it unnecessary to consider any of the other arguments. On appeal, this court held that the statute did not violate Article IX, section 1, and remanded the case to the trial court. See Bush v. Holmes, 767 So.2d 668 (Fla. 1st DCA 2000) (Bush I). The plaintiffs then sought discretionary review in the supreme court. Although the supreme court could have exercised its discretion to hear the case at that time, on the ground that our decision expressly and directly construed a provision of the state constitution, the court declined to accept the case for review. See Holmes v. Bush, 790 So.2d 1104 (Fla.2001).
On remand, another trial judge declared the statute unconstitutional for a different reason; that it violated the "no aid" provision in Article I, section 3. That decision was affirmed in an en banc decision of this court in which five members of the court, none of whom had participated in the earlier panel decision, expressed the view that the statute also violated the guarantee of a uniform system of public education. See Bush v. Holmes, 886 So.2d 340 (Fla. 1st DCA 2004) (Bush II). At this point, all of the issues raised in the case had been decided in the trial court and in the district court of appeal. The case was presented once again to the supreme court and the court held that the statute violated the Article IX, section 1, an issue it had declined to hear six years earlier.
We do not know for a certainty why the supreme court initially declined to hear the issue that would become the controlling issue in such an important case, but the most logical explanation is that the court concluded that it had no present need to decide the issue. The supreme court may have considered the possibility that the case would be resolved on another ground or it may have preferred to allow the lower courts to address all of the issues in the case before it considered a single issue in isolation.
*570 Moreover, the supreme court must have been aware in 2001, when it first declined to consider the issue, that it would have an opportunity to address it in the future if the need arose. The issue was one that simply could not escape supreme court review. A decision by this court upholding the statute would have been subject to discretionary review in the supreme court under article V, section 3(b)(3) on the ground that the district court declared a state constitutional provision valid, and a decision by this court striking the statute down would be reviewable in the supreme court under Article V, section 3(b)(1), by direct appeal. The present case is in exactly the same posture. The supreme court may never need to decide whether the adoption of a constitutional amendment in a general election cures a fraud in gathering the necessary signatures to place the proposed amendment on the ballot, and if it does, the issue is not one that could evade the supreme court's jurisdiction. If the plaintiffs prove that the defendants committed a fraud and that the fraud was material, the case will come to this court once again. And, if this court were to conclude that the constitutional amendment at issue is invalid on the ground that the defendants procured the signatures by fraud, the decision would be reviewable by direct appeal to the supreme court. Until then, I see no reason to ask the supreme court to address the issue.
Perhaps those who support the decision to certify the questions in this case are concerned about the precedent we have made in reversing the summary judgment. It is true that the precedent will stand as a part of the Florida law regardless of the outcome of this case in the trial court, but I fail to see to the potential harm in that. The decision does not stand for a remarkable proposition. To the contrary, this court was required to use only its common sense to say that an election approving a proposed constitutional amendment does not cure a fraud that, if discovered earlier, would have prevented the amendment from being placed on the ballot in the first place. That the issue is not one that is close is further shown by the fact that nine of the twelve members of the court participating in the case have joined in the decision. In the final analysis the decision stands for a very simple principle: the end does not justify the means.
Moreover, the decision is not one that could ever cause a constitutional amendment to be invalidated without further review by the supreme court. If an appellate court declares some other amendment invalid years later on the strength of the precedent we have set here, the decision would be directly appealable to the supreme court. In short, the precedent we have set is one that could never be carried out without the approval of the supreme court.
For these reasons, I believe that the certification in this case is premature. We should not ask the supreme court to address these constitutional issues until the case has been concluded in the trial court.
NOTES
[1] An order granting summary judgment is reviewed de novo. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.
[2] Appellants alleged appellee Floridians for a Level Playing Field ("FLPF") committed massive fraud to create the illusion of compliance with obtaining the requisite number of signed petitions. Ordinarily, whether fraud was actually committed would create a question of material fact, precluding summary judgment. However, for purposes of summary judgment, FLPF does not contest these factual assertions.
[3] The circuit court's reliance on Krivanek v. Take Back Tampa Political Committee, 625 So.2d 840 (Fla.1993), for the proposition that courts are barred by the doctrine of separation of powers from determining whether fraud was committed in the initiative petition process is misplaced. Krivanek stands for the proposition that election officials are accorded deference in interpreting election laws and performing their duties. Id. at 844-45. It does not stand for the proposition that courts are powerless to correct fraud that has misled the election officials themselves. "The constitution expressly authorizes judicial review of . . . amendments proposed by citizen initiative." Armstrong v. Harris, 773 So.2d 7, 13-14 n. 18 (Fla.2000) (noting courts have long been the proper forum in which to litigate the validity of such amendments). Therefore, we also reverse the final summary judgment on this basis.
[4] Defects in the form of submission are "mere formal or procedural irregularities," State ex rel Landis v. Thompson, 120 Fla. 860, 163 So. 270, 276 (1935), such as the proposed amendment being "printed in clear and legible type and a copy thereof conspicuously posted at each voting precinct," Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892, 895 (1944), or the failure of the Legislature to have the "proposed amendment entered at length upon the journals of the two respective houses." West v. State, 50 Fla. 154, 39 So. 412, 415 (1905).
[5] The dissent asserts that Appellants conceded during oral argument that there is no difference between fraud and mistake or defect in failing to obtain the requisite number of signatures for placement on the ballot. To the extent Appellants conceded this legal issue, we reject it as erroneous. See Perry v. State, 808 So.2d 268 (Fla. 1st DCA 2002) (ruling that erroneous concessions should not be accepted by an appellate court).
[6] Moreover, it is difficult to say how the voting public would have voted on the amendment if the public knew it was placed on the ballot by the proponent's fraudulent conduct. "[I]t is impossible to say with any certainty what the vote of the electorate would have been `if the voting public had been given the whole truth.'" Armstrong, 773 So.2d at 21 (citations omitted). When a voter casts a ballot, it should be based on "the full truth;" "[t]o function effectively  and to remain viable  a constitutional democracy must require no less." Id.
[*] Because this court now archives videos of oral arguments, the entire oral argument in this case, 1D05-575, is available to the public at www.1dca.org.
[7] For a more detailed discussion of the history and purpose of the 1980 revision of Article V, see Arthur J. England, Jr., Eleanor Mitchell Hunter, and Richard C. Williams, Jr., Constitutional Jurisdiction of the Supreme Court of Florida: 1980 Reform, 32 Fla. L.Rev. 147 (1980).
[8] Justice Overton used this phrase to characterize the role of the district courts prior to the 1980 revision. See Ben F. Overton, District Courts of Appeal: Courts of Final Jurisdiction with Two New Responsibilities  An Expanded Power to Certify Questions and Authority to Sit En Banc, 35 Fla. L.Rev. 80 (1980).