29 So.3d 1053 (2010)
Kurt S. BROWNING, etc., et al., Appellants,
v.
FLORIDA HOMETOWN DEMOCRACY, INC., PAC, et al., Appellees.
No. SC08-884.
Supreme Court of Florida.
February 18, 2010.
*1057 Bill McCollum, Attorney General, Scott D. Makar, Solictor General, Courtney Brewer, Craig D. Feiser, Deputy Solicitors General, Blaine H. Winship, Assistant Attorney General, Tallahassee, FL; Lynn C. Hearn, General Counsel, Florida Department of State, Tallahassee, FL, for Appellants.
Ross Stafford Burnaman, Tallahassee, FL, for Appellees.
PER CURIAM.
This case is before the Court on appeal from the decision reported as Florida Hometown Democracy, Inc. v. Browning, 980 So.2d 547 (Fla. 1st DCA 2008), in which the First District Court of Appeal held that the signature-revocation provisions of section 100.371, Florida Statutes (2007), and associated implementing regulations (i.e., Florida Administrative Code Rules 1S-2.0091 and 1S-2.0095), are unconstitutional in violation of article XI, section 3 of the Florida Constitution, which delineates the citizen-initiative method of amending this foundational document.[1] We thus possess mandatory appellate jurisdiction to resolve this case under article V, section 3(b)(1) of the Florida Constitution.[2] As further explained in our analysis, we affirm the decision of the First District because the politically charged counter-petition revocation campaigns created by these provisions in operation would essentially eviscerate and render meaningless the citizen-initiative process. Such campaigns are neither contemplated nor permitted by the self-executing plain text of article XI, nor are they "necessary to ensure ballot integrity." State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561, 566 (Fla.1980) (emphasis supplied).
While the Legislature and the Secretary of State have an obligation to ensure ballot integrity and a valid election process, these parties possess only "limited authority to adopt regulations that affect the initiative process." Smith v. Coalition to Reduce *1058 Class Size, 827 So.2d 959, 962 (Fla.2002) (emphasis supplied).
We must ensure that any legislation and administrative rules affecting the initiative process are either neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI, or, if otherwise, are "necessary for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process." Tax Relief, 386 So.2d at 566 (emphasis supplied). In other words, as a condition precedent for validity, legislative and executive measures affecting the initiative process that are neither expressly authorized in article XI, sections 3 and 5, nor implicitly contemplated by these constitutional provisions, must be necessary for ballot integrity. Our precedent further communicates that authentication efforts intended to preserve the integrity of the petition process should be conducted and supervised by neutral election officials rather than biased advocates. See Krivanek v. Take Back Tampa, 625 So.2d 840, 844-45 (Fla.1993) (holding that voter-registration status-confirmation forms should be "presented directly to a neutral election official rather than a biased advocate" (emphasis supplied)); cf. Crawford v. Marion County Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 1623-24, 170 L.Ed.2d 574 (2008) (upholding Indiana's neutrally administered, nondiscriminatory voter-ID law) (plurality opinion).
The legislation and administrative rules at issue in this case fail each of these requirements. Ultimately, alteration of the initiative process through measures that are not expressly or implicitly contemplated by article XI, sections 3 and 5 of the Florida Constitution, and are not necessary to ensure ballot integrity, must be accomplished through constitutional amendment. Along with our colleagues at the First District, we remain firmly committed to these well-established legal principles and, accordingly, we affirm the decision of the First District below.

BACKGROUND

Section 100.371, Florida Statutes (2007), and Its Implementing Regulations
During its 2007 regular session, the Legislature adopted chapter 2007-30, Laws of Florida. In relevant part, the act's title provides that the legislation amended section 100.371, Florida Statutes, by "providing procedures for revocation of a signature on a petition form." Ch.2007-30, title, at 321-22, Laws of Fla. Effective August 1, 2007, section 25 of chapter 2007-30 amended subsection (1) of section 100.371, Florida Statutes, fashioned a new subsection (6), and amended and transferred the prior contents of subsection (6) to new subsection (7). Despite the gloss presented by the act's title, these statutory changes did not merely "provide procedures"; rather, they "established" a substantive revocation concept that was previously foreign to Florida's constitutional petition-circulation process. § 100.371(1), Fla. Stat. (2007); ch.2007-30, § 25, at 339-40, Laws of Fla. As amended, these statutory subsections provide:
(1) Constitutional amendments proposed by initiative shall be placed on the ballot for the general election, provided the initiative petition has been filed with the Secretary of State no later than February 1 of the year the general election is held. A petition shall be deemed to be filed with the Secretary of State upon the date the secretary determines that valid and verified petition forms have been signed by the constitutionally required number and distribution of *1059 electors under this code, subject to the right of revocation established in this section.

....
(6)(a) An elector's signature on a petition form may be revoked within 150 days of the date on which he or she signed the petition form by submitting to the appropriate supervisor of elections a signed petition-revocation form adopted by rule for this purpose by the division [of elections].
(b) The petition-revocation form and the manner in which signatures are obtained, submitted, and verified shall be subject to the same relevant requirements and timeframes as the corresponding petition form and processes under this code and shall be approved by the Secretary of State before any signature on a petition-revocation form is obtained.
(c) Supervisors of elections shall provide petition-revocation forms to the public at all main and branch offices.
(d) The petition-revocation form shall be filed with the supervisor of elections by February 1 preceding the next general election or, if the initiative amendment is not certified for ballot position in that election, by February 1 preceding the next successive general election. The supervisor of elections shall promptly verify the signature on the petition-revocation form and process such revocation upon payment, in advance, of a fee of 10 cents or the actual cost of verifying such signature, whichever is less. The supervisor shall promptly record each valid and verified petition-revocation form in the statewide voter registration system in the manner prescribed by the Secretary of State.
(7) The Department of State may adopt rules in accordance with s. 120.54[, Florida Statutes,] to carry out the provisions of subsections (1)-(6).

§ 100.371(1), (6)-(7), Fla. Stat. (2007) (emphasis supplied).
Pursuant to the bounded rule-making authority conferred by sections 100.371(7) and 120.54, Florida Statutes (2007), the Department of State later promulgated two administrative rules to implement this newly minted concept of signature revocation. See Fla. Admin. R. 1S-2.0091, 1S-2.0095. In sum, the material portions of these rules outline:
1) Subject to the Secretary of State's format approval of signature-revocation forms, rival political action committees are primarily responsible for drafting, distributing, marketing, and submitting such forms, see Fla. Admin. R. 1S-2.0095(1)-(2), (6)-(7), (11);
2) These entities have a 150-day window following an elector's signature of a petition-initiative form in which to persuade the elector to revoke his or her signature, see Fla. Admin. R. 1S-2.0095(8)(a)2.;[3]
3) Political action committees conducting signature-revocation campaigns have until 5:00 p.m. on February 1 preceding the pertinent general election to obtain the relevant supervisor of elections' verification of these revocation forms (thus making it practically impossible for initiative proponents to determine whether they have obtained the requisite number and distribution of verified signatures until it is too late to gather, submit, and verify additional signatures), see Fla. Admin. R. 1S-2.0095(10); and

*1060 4) Political action committees conducting signature-revocation campaigns possess a definitive edge in the signature-persuasion process. To wit, once they persuade an elector to revoke his or her signaturefor whatever reasonthe elector is forever prohibited from changing his or her mind to, instead, reestablish support for placement of the initiative proposal on the election ballot, see Fla. Admin. R. 1S-2.0091(2)(a)2., 1S-2.0095(12).
Therefore, section 100.371 permits, and the administrative rules create, a framework for partisan-fueled counter-petition revocation campaigns, which seek to broadly persuade elector-signatories that they should revoke their prior signatures for any number of asserted reasons, even if illegitimate.
These signature-revocation campaigns are inherently designed to vitiate the effectiveness of the petition-circulation process because those entities conducting revocation campaigns may submit their gathered revocation forms as late as February 1 preceding the relevant general election, which is the same date on which the Secretary of State must verify whether the initiative proponents have gathered enough signatures to secure ballot placement. Hence, initiative proponents will likely receive no notice with regard to how many of their gathered, signed petition forms have been revoked until it is too late to gather, submit, and verify additional signatures. In operation, this timing requirement would erase the citizen-initiative process from article XI because, under this framework, it is simply impossible for initiative proponents to ascertain the number of signatures necessary for ballot placement before the time to do so expires. The uncertainty engendered by this pro-revocation timeframe further complicates our constitutional duty to review an initiative proposal's ballot title and summary, which is triggered by the attainment of a verified-signature threshold. See art. IV, § 10, Fla. Const.; art. V, § 3(b)(10), Fla. Const.; §§ 15.21(3), 16.061(1), Fla. Stat. (2007).
As counsel for Secretary Browning conceded during oral argument, it is readily apparent that such campaigns address far more than alleged instances of signature forgery or fraud. In a targeted fashion, these campaigns seek to change elector-signatories' minds (for whatever reason) before any ensuing amendment referendum and accompanying public discourse occur pursuant to article XI, sections 3 and 5 of the Florida Constitution. Rather than curbing any alleged fraudulent practices present in the petition-circulation process, these provisions incentivize a race to the bottom in which partisan factions compete to "persuade" Florida's electors to revoke previously provided signatures. Furthermore, these provisions provide a trump card to one side of this signature-gathering process: Once an elector has signed but later revoked his or her signature, he or she may NEVER again sign the relevant initiative petition and, in a parallel fashion, initiative proponents are forever prohibited from obtaining this elector's support to place the initiative proposal on the ballot for the next general election. See Fla. Admin. Code R. 1S-2.0091(2)(a)2., 1S-2.0095(12) ("Irrevocable Effect of Revocation"); § 104.185(1), Fla. Stat. (2007) (providing that it is a first-degree misdemeanor to knowingly sign an initiative petition on more than one occasion, and failing to provide an exception for electors who previously revoked their signatures); § 104.091, Fla. Stat. (2007) (providing that persons who aid, abet, or advise another concerning violation of the Florida Election Code shall be punished as principals and that co-conspirators and confederates *1061 shall be punished as if they directly committed the relevant offense(s)). Indeed, the record before us contains evidence that frustrated Florida electors were actually duped and misled by a partisan letter into revoking their signatures only to later discover that they would face potential criminal prosecution if they attempted to re-sign the relevant initiative petition.
Article XI, sections 3 and 5 do not expressly or implicitly contemplate signature revocation, and signature revocation is certainly not necessary to ensure ballot integrity and a valid election process. The restrictions that the instant provisions place on the petition-circulation process substantially reduce the size of the audience that the sponsor can reach, and render it less likely that the sponsor can garner the requisite number of signatures to place the proposed amendment on the ballot, while not passing muster under the constitutionally required level of scrutiny, which obligates the State to affirmatively establish that its restrictions on the initiative process are necessary for ballot integrity. See Class Size, 827 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67.
Our decision today recognizes and fosters the ability of initiative proponents and opponents to advocate on behalf of the signature or non-signature of any initiative proposal. However, consistent with the express and implied dictates of article XI, any such signature-persuasion debate must occur before an elector has signed an initiative petition. The Legislature's decision to establish a process for initiative opponents to secure a non-rebuttable, unopposed opportunity to persuade electors to revoke their signatures for whatever reason even if misinformed or uninformeddoes not provide the level playing field envisioned by the Secretary and the dissent. Instead, the proverbial deck is stacked in favor of initiative opponents, who could strategically target elector-signatories in a single electoral district or in the state as a whole to revoke their signatures for any reason whatsoever. See art. XI, § 3, Fla. Const. (providing signature numerosity and distribution requirements that apply to electoral "districts respectively and in the state as a whole" (emphasis supplied)).
If, in reality, an elector's purported "signature" is a forgery, or was the result of fraud,[4] then there is no need to "revoke"[5] the "signature" because such "signatures" are invalid and void ab initio. See Floridians Against Expanded Gambling v. Floridians for a Level Playing Field, 945 So.2d 553, 561-62 (Fla. 1st DCA 2006) (explaining that forged and fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, section 3), review dismissed, 967 So.2d 832 (Fla.2007). We conclude that fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, section 3 because such false manifestations of assent are not the valid elector "signatures" contemplated by our state Constitution. Furthermore, the Legislature and the judicial branch have already provided alternative mechanisms through which such fraud *1062 may be discouraged, discovered, and remedied.

Florida Hometown Democracy's Action for Declaratory and Injunctive Relief
In response to these efforts to alter the initiative-circulation process, Florida Hometown Democracy, Inc. ("FHD"),[6] and Lesley G. Blackner, a registered elector of Palm Beach County and FHD's president and chairperson, filed a circuit-court action on August 22, 2007, against Secretary Browning, in his official capacity, and the Florida Department of State, Division of Elections seeking a declaration that chapter 2007-30, section 25, Laws of Florida, and its implementing administrative rules represent an unconstitutional alteration of the initiative process in violation of article XI, sections 3 and 5 of the Florida Constitution. FHD and Blackner further sought injunctive relief to prevent the enforcement of these provisions. During the circuit-court proceedings, Save Our Constitution, Inc., a political action committee formed to carry out a signature-revocation campaign against FHD's initiative proposal, intervened pursuant to Florida Rule of Civil Procedure 1.230.[7]
Following the filing of cross-motions for summary judgment, the circuit court entered final summary judgment in favor of Secretary Browning and the Division of Elections on November 27, 2007. See generally Fla. R. Civ. P. 1.510. The circuit court entered this summary judgment based upon three conclusions of law: (1) the Legislature was supposedly owed great deference in this context; (2) the revocation provisions did not change or add to the requirements provided in article XI, section 3 of the Florida Constitution; and (3) the provisions did not strengthen the power of the Legislature vis-à-vis the people. On this same date, FHD and Blackner filed a timely notice of appeal.

The Appeal to the First District
On appeal, the First District reversed the summary judgment and rendered its decision in favor of FHD and Blackner. *1063 Specifically, the district court held that the challenged legislation and implementing rules are neither contemplated by the self-executing plain text of article XI nor necessary to ensure ballot integrity and a valid election process. See Fla. Hometown Democracy, Inc. v. Browning, 980 So.2d 547, 548-50 (Fla. 1st DCA 2008). In so holding, the district court correctly examined and applied our controlling precedent in State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980), and Smith v. Coalition to Reduce Class Size, 827 So.2d 959 (Fla.2002). We accordingly affirm the decision of the First District based upon our analysis below.

ANALYSIS
This case presents a question of constitutional interpretation, which is subject to de novo review. See, e.g., Zingale v. Powell, 885 So.2d 277, 280 (Fla.2004). Two primary considerations guide our inquiry and analysis concerning whether these signature-revocation provisions violate article XI of the Florida Constitution. First,
[t]he fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it. Such a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.
Gray v. Bryant, 125 So.2d 846, 852 (Fla. 1960). Second, article XI, section 3 is a "self-executing" constitutional provision, which was adopted to bypass legislative and executive control and to provide the people of Florida a narrow but direct voice in amending their fundamental organic law. See Class Size, 827 So.2d at 962; Tax Relief, 386 So.2d at 566. As a result, article XI, section 3 provides an additional check and balance[8] against legislative and executive power, which is not present at the federal level. Compare art. XI, § 3, Fla. Const., with U.S. Const. art. V. Hence, Secretary Browning and the dissent's shared assertion that the Legislature and the executive branch possess broad power to regulate the initiative process, subject in all cases to deferential review, is in direct conflict with the very nature of the conferred fundamental right, which acts as a check on such power. See, e.g., Class Size, 827 So.2d at 962 (holding that these parties possess only "limited authority to adopt regulations that affect the initiative process." (emphasis supplied)). With little to no explanation, the dissent overlooks the necessarily "limited authority" that the Legislature and executive branch may exercise in this area. Id. (emphasis supplied). Here, the broad, substantive authority that the Secretary and our dissenting colleagues would ascribe to the Legislature and executive is simply inconsistent with our precedent.
Simply because the initiative-petition method of amending the Florida Constitution is a state-created constitutional right does not mean that the Legislature possesses unbounded authority to limit the constitutional right. In fact, the Legislature has only limited authority in this area. See Tax Relief, 386 So.2d at 566 ("[T]he initiative petition method to amend the constitution is a fundamental right and any rule or statute which regulates this initiative process must not unduly burden the petitioners' initiative access." (emphasis *1064 supplied)); see also Class Size, 827 So.2d at 962; Meyer v. Grant, 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) ("Having decided to confer the right, the State was obligated to do so in a manner consistent with the Constitution."). It remains a basic legal principle that "no department, not even the legislative, has unlimited power under our system of government." Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892, 899 (1944) (quoting State v. City of Stuart, 97 Fla. 69, 120 So. 335, 347 (1929)).
We must consequently ensure that legislation and administrative rules affecting the initiative process are either neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI, or, if otherwise, are "necessary for ballot integrity." Tax Relief, 386 So.2d at 566 (emphasis supplied).

Self Executing
Article XI, section 3 is self-executing,[9] which means that this "provision lays down a sufficient rule by . . . which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment." Gray, 125 So.2d at 851 (emphasis supplied). On one hand, constitutional provisions are presumed self-executing to prevent the Legislature from nullifying the will of the people as expressed in their Constitution. See Gray, 125 So.2d at 851. On the other hand, the Legislature may provide additional laws addressing a self-executing constitutional scheme assuming that such laws supplement, protect, or further the availability of the constitutionally conferred right, but the Legislature may not modify the right in such a fashion that it alters or frustrates the intent of the framers and the people. See id. at 851; Notami Hosp. of Fla., Inc. v. Bowen, 927 So.2d 139, 144 (Fla. 1st DCA 2006), affirmed sub nom. Fla. Hosp. Waterman, Inc. v. Buster, 984 So.2d 478 (Fla.2008).
Two fundamental principles of constitutional interpretation reinforce the limited role[10] that the Legislature and the executive branch occupy with regard to the initiative process: (1) "The Constitution is the charter of our liberties. It cannot be changed, modified or amended by [governmental] fiat. It provides within itself the only method for its amendment," Thomas v. State ex rel. Cobb, 58 So.2d 173, 174 (Fla.1952); and (2) "When a constitution directs how a thing shall be done, that is in effect a prohibition to its being done in any other way." Id. at 178 (quoting State ex rel. Murphy v. Barnes, 24 Fla. 29, 3 So. 433, 434 (1888)). For these reasons, we have previously held:
In considering any legislative act or administrative rule which concerns the initiative amending process, we must be careful that the legislative statute or implementing rule is necessary for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process. The delicate symmetric balance of this constitutional scheme must be maintained, and any legislative act regulating the process should be allowed only when necessary to ensure ballot integrity.

*1065 Tax Relief, 386 So.2d at 566 (emphasis supplied); see also Class Size, 827 So.2d at 962-63.

Prior Precedent
In State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980), we held that article XI, section 3's requirement that the initiative sponsor "file" its petition with the custodian of state records[11] "containing a copy of the proposed revision or amendment, signed by [the requisite] number of electors" implicitly supported a mandatory verification of elector signatures by the supervisors of elections, and that signature verification was "necessary to ensure ballot integrity." Id. at 566-67 (emphasis supplied); cf. § 99.097, Fla. Stat. (2007) (providing for neutral verification of initiative-petition signatures by the supervisors of elections). This holding is logically unassailable: an initiative sponsor has not satisfied the plain text of article XI, section 3 unless it has filed with the custodian of state records the requisite number of valid signatures from actual, qualified electors; otherwise, the proffered "signatures" are not truly signatures in the constitutional sense. See Expanded Gambling, 945 So.2d at 561-62. We further held that statutory law and administrative rules may not contradict the time constraints already provided by article XI, section 5. See Tax Relief, 386 So.2d at 567. In the process of rendering these holdings, we articulated the "necessary to ensure ballot integrity" standard for the express purpose of preserving the "delicate symmetric balance" created by article XI. Id. at 566 (emphasis supplied).
Approximately thirteen years later, in Krivanek v. Take Back Tampa Political Committee, 625 So.2d 840 (Fla.1993), we addressed the effect of a voter-registration list maintenance program[12] on 462 electors who had previously signed a political action committee's initiative petition to amend the Tampa City Charter. See id. at 841-42. As part of this program, these voters were temporarily removed from the permanent voter-registration books. Consequently, the committee did not possess sufficient signatures to place its initiative issue on the ballot. See id. Take Back Tampa thus involved an analogous attempt to amend a local-government charter by initiative, but did not directly involve the citizen-initiative method of amending the Florida Constitution.
In explaining our decision, we stated:

Given its constitutional underpinnings, the right to petition is inherent and absolute. This does not mean, however, that such a right is not subject to reasonable regulation. Quite the contrary, reasonable regulations on the right to vote and on the petition process are necessary to ensure ballot integrity and a valid election process. See, e.g., State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980) (legislature and secretary of state may impose reasonable regulations on process of petition validation to ensure *1066 expeditious and proper verification of petition signatures).
Id. at 843 (emphasis supplied). We also emphasized that, by its very nature, the maintenance of accurate voter-registration lists is intended "to prevent fraud and to assure integrity in the electoral process," and that such authentication efforts should be conducted and supervised by neutral election officials rather than biased advocates. Take Back Tampa, 625 So.2d at 845. We ultimately held that voter-registration list maintenance programs are a neutral and "necessary [means] to ensure ballot integrity" and that "an elector whose name has been temporarily removed from the registration books is not a qualified voter for the purpose of executing a petition." Id. at 843, 845.
Finally, in Smith v. Coalition to Reduce Class Size, 827 So.2d 959 (Fla.2002), we addressed the Legislature's statutory mandate to include a financial-impact statement on the ballot for all initiative-proposed amendments and revisions. See generally ch.2002-390, Laws of Fla. In the process of analyzing the constitutionality of this legislative act, we extensively quoted Tax Relief and reaffirmed its adoption and articulation of the "necessary to ensure ballot integrity" standard. See Class Size, 827 So.2d at 962-63. Our opinion further emphasized that "[a]rticle XI does not contain any language, either explicit or implicit, regarding the fiscal impact of initiatives." Id. at 963 (emphasis supplied). We thus (1) built upon the standard originally enunciated in Tax Relief, (2) recognized that the Legislature and executive branch possess only "limited authority to adopt regulations that affect the initiative process," and (3) clarified that "ballot integrity . . . is a prerequisite for any legislative involvement in the initiative process." Class Size, 827 So.2d at 962, 964 (emphasis supplied). We therefore held that the Legislature's statutory addition of financial-impact statements upset the "delicate symmetric balance" created by article XI and was not necessary to ensure ballot integrity. See id. at 962-65. However, article XI, section 5 was later amended to require that the Legislature provide, by general law, for financial-impact statements concerning initiative proposals. See art. XI, § 5(c), Fla. Const.
A combined reading of these decisions produces the following guiding precept: We must ensure that any legislation and administrative rules impacting the initiative process are either neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI, or, if otherwise, are necessary for ballot integrity since any restriction on the initiative process strengthens the authority and power of the Legislature and weakens the power reserved by article XI, section 3. Cf. FHD, Inc. v. Browning, 980 So.2d at 548-50 (expressing a similar approach and concluding that "modification of the initiative process through measures which are not necessary to ensure ballot integrity must be accomplished through amendment of article XI"); Dermer v. Miami-Dade County, No. 07-21308-CIV, 2008 WL 2955152, at *19-*20 (S.D.Fla. Aug.1, 2008) (similar) (judgment stayed in part pending decision in Browning v. Fla. Hometown Democracy, Inc., 29 So.3d 1053, 2010 WL 546768 (Fla.2010)). Take Back Tampa does not stand for the proposition that reasonableness in the abstract is the proper measure of whether a regulation is "necessary to ensure ballot integrity." We clearly rejected such contentions in Tax Relief and Class Size. Instead, Take Back Tampa merely communicates that neutral, nondiscriminatory regulation of petition-circulation and voting procedure, which ensures compliance with the explicit or *1067 implicit requirements of charter-based or constitutionally-based initiative circulation, preserves ballot integrity. Specifically, in that case, the voter-registration list maintenance program ensured that the purported "electors" were actually qualified and registered electors pursuant to Florida law. Compare art. XI, section 3, Fla. Const. (stating that an initiative petition must be signed by the requisite number of "electors"), with ch. 98, Fla. Stat. (2007) (creating a comprehensive system of voter-registration list maintenance).
Additional explicit or implicit requirements[13] provided by article XI, sections 3 and 5 include, inter alia: (1) the initiative-petition form presented to electors for their signatures must contain an accurate explanation of the initiative proposal, see art. XI, § 3, Fla. Const. (stating that an initiative sponsor must file "a petition containing a copy of the proposed revision or amendment . . . signed by [the requisite] number of electors" (emphasis supplied)), see also § 100.371(2), Fla. Stat. (2007); Fla. Admin. R. 1S-2.009 (implementing this requirement); (2) the proffered "signatures" must actually constitute the valid signatures of qualified, registered electors (i.e., no forged, fraudulent, or otherwise invalid signatures are included in attaining the required number of signatures), see art. XI, § 3, Fla. Const. (providing that an initiative petition must be "signed" by the requisite number of "electors"), § 99.097, Fla. Stat. (2007) (providing for signature verification); (3) initiative-petition forms must contain enough information to enable the State to determine whether a signature is valid and whether an elector is duly qualified and registered, see art. XI, § 3, Fla. Const. (providing that an initiative petition must be "signed" by the requisite number of "electors"), see also § 100.371(3)(a)-(d), Fla. Stat. (2007) (implementing this requirement); (4) initiative proposals must comply with the single-subject requirement (save for those "limiting the power of government to raise revenue"), see art. XI, § 3, Fla. Const.; (5) to attain ballot placement, the gathered signatures must satisfy the signature numerosity and distribution requirements, see art. XI, § 3, Fla. Const.; (6) the Legislature must provide, by general law, for corresponding financial-impact statements, see art. XI, § 5(c), Fla. Const.; see also § 100.371(5), Fla. Stat. (2007) (implementing this requirement); (7) initiative sponsors must comply with the notice-publication requirements of article XI, section 5(d); and (8) a uniform process must exist through which initiative sponsors submit initiative petitions to the State to confirm compliance with the explicit and implicit requirements of article XI, sections 3 and 5, see § 101.161(2), Fla. Stat. (2007); § 100.371, Fla. Stat. (2006) (implementing this requirement). The Constitution further provides for our review of an initiative proposal's ballot title and summary, and we have held that article XI, section 5 implicitly requires accuracy, clear expression, and locational specificity with regard to all amendment or revision proposals. See art. *1068 IV, § 10, Fla. Const.; art. V, § 3(b)(10), Fla. Const.; Armstrong, 773 So.2d at 14-22; see also § 101.161(1), Fla. Stat. (2007) (codifying article XI, section 5's implicit accuracy requirement).
These observations include and address each aspect of permissible initiative regulation that the dissent incorrectly identifies as unsupported by the Florida Constitution. See dissenting op. at 1080-81. As our analysis clarifies, each of these largely procedural regulations is explicitly or implicitly supported by the text of the Florida Constitution, and each is ultimately administered or supervised by neutral election officials. Conversely, as we explain throughout this decision, these substantive signature-revocation provisions in no way resemble permissible, neutrally administered regulation of the initiative process.
Accordingly, any additional regulation of this "self-executing" process must supplement, protect, or further make available the conferred right, but may not modify the right in such a fashion that it alters or frustrates the intent of the framers and the people. Cf., e.g., Gray, 125 So.2d at 851.

Supplemental Regulation of the Initiative Process Must Either Constitute Neutral, Nondiscriminatory Regulation of Petition-Circulation and Voting Procedure or be Necessary for Ballot Integrity
When a statute or administrative rule provides a neutral, nondiscriminatory procedural regulation that confirms compliance with the explicit or implicit requirements of article XI, sections 3 and 5, the State is merely exercising its traditional power to regulate election processes, and we have no occasion to question whether such regulation is "necessary to ensure ballot integrity" within the meaning of Tax Relief and Class Size. This is the message conveyed by Biddulph v. Mortham, 89 F.3d 1491 (11th Cir.1996), in which an initiative proponent challenged the constitutionality of Florida's neutrally administered, procedural regulations with regard to judicial review of initiative ballot titles and summaries. However, when statutes or administrative rules restrict the initiative process by providing substantive requirements that are foreign to article XI,[14] we must uphold the self-executing nature of these constitutional provisions and ensure that such regulations are necessary for ballot integrity in the strictest sense of the word.[15]See Class Size, 827 *1069 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67. Any other approach would jeopardize the "delicate symmetric balance" inherent in article XI and would fail to provide sufficient protection for the associated rights conferred by article I, sections 4 and 5 of the Florida Constitution. See Class Size, 827 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67.

The Signature-Revocation Provisions of Section 100.371, Florida Statutes (2007), and Its Implementing Regulations Fail to Satisfy These Standards
Meanwhile, Secretary Browning contends that the prevention of signature fraud and forgery supports the Legislature's creation of this revocation concept, but concedes that revocation campaigns address far more than alleged instances of signature forgery or fraud. In addition, this newly created revocation concept provides a definite advantage to initiative opponents because the applicable regulations establish that if an elector signs a petition but later revokes his or her signature (even if fraudulently induced to do so), he or she may NEVER again sign the relevant initiative petition and, in a parallel fashion, initiative proponents are forever prohibited from obtaining the elector's support to place the initiative proposal on the ballot for the next general election. See Fla. Admin. Code R. 1S-2.0091(2)(a)2., 1S-2.0095(12) ("Irrevocable Effect of Revocation"). The Legislature has also criminalized the act of knowingly signing an initiative petition on more than one occasion, and has failed to provide an exception for electors who previously revoked their signatures. See § 104.185(1), Fla. Stat. (2007). Relatedly, initiative proponents who aid, abet, or advise an elector with regard to knowingly re-signing an initiative petition following revocation are subject to criminal prosecution as principal offenders. See §§ 104.091, 104.185(1), Fla. Stat. (2007).
Of further concern is the fact that these provisions vest rival political action committees with the primary responsibility for drafting, distributing, marketing, and submitting petition-revocation forms, and render it practically impossible for initiative proponents to determine whether they have obtained the requisite number and distribution of verified signatures until it is too late to gather, submit, and verify additional signatures. See § 100.371(1), (6), Fla. Stat. (2007) (providing that the Secretary of State must verify "that valid and verified petition forms have been signed by the constitutionally required number and distribution of electors" no later than February 1 preceding the relevant general election, while providing that initiative opponents may submit petition-revocation forms by this same date); Fla. Admin. R. 1S-2.0095(1)-(2), (6)-(7), (11); Fla. Admin. R. 1S-2.0095(10); cf. Take Back Tampa, 625 So.2d at 844-45 (holding that voter-registration status-confirmation forms should be "presented directly to a neutral election official rather than a biased advocate" (emphasis supplied)). These provisions thus decidedly favor initiative opponents and restrict and discourage the advocacy efforts of initiative proponents. The contrary position advanced by our dissenting colleagues is unsupported by the substance of the revocation provisions.
Therefore, the statute and its implementing regulations are not well calculated to reduce perceived instances of forgery and fraud. To the contrary, they provide initiative opponents an unchecked, unopposed opportunity to "persuade" Florida electors by any means, including illicit, to revoke their signatures based upon these opponents' strident disagreement with the underlying initiative proposals.

*1070 The Signature-Revocation Provisions Are Not Neutral, Nondiscriminatory Regulations of Petition-Circulation and Voting Procedure

We have likely already answered this question, but in accord with our standards, we must first ask whether these signature-revocation provisions are neutral, nondiscriminatory regulations of petition-circulation and voting procedure, which are explicitly or implicitly contemplated by article XI. We hold that they are not. Section 100.371(1), (6)-(7), Florida Statutes (2007), and Florida Administrative Rules 1S-2.0091 and 1S-2.0095 unmistakably create substantive provisions that were previously foreign to article XI[16] and advance an agenda that clearly favors revocation proponents, who are afforded an unopposed opportunity to convince electors to revoke their signatures for whatever reason, legitimate or illegitimate.
In contrast, article XI, sections 3 and 5 contemplate an initiative effort to gather signatures based upon the proposed amendment followed by a ballot referendum assuming that the sponsor timely attains and fulfills each constitutionally based requirement. Placing a signature upon an initiative petition does not signify one's definitive agreement with a proposed amendment or revision; rather, one is merely agreeing that the proposal is worthy of statewide consideration and discourse for a vote at a later date. If an elector simply changes his or her mind in this regard, he or she remains free to participate in public discussion and to vote against the proposal. See art. XI, § 5(b), Fla. Const.; see also art. XI, § 5(e), Fla. Const. (providing that an initiative proposal must garner the votes of "at least sixty percent of the electors voting on the measure" to secure passage). Alternatively, if an elector's purported "signature" is a forgery or was the result of fraud, there is no need to "revoke" the "signature" because such "signatures" are invalid and void ab initio. See Expanded Gambling, 945 So.2d at 561-62.

The Signature-Revocation Provisions Are Not Necessary to Ensure Ballot Integrity
Since these provisions are not neutral, nondiscriminatory regulations of petition-circulation and voting procedure, *1071 which are explicitly or implicitly contemplated by article XI, we must address a second inquiry: whether these provisionsdespite their lack of implicit or explicit support in article XIare necessary for ballot integrity. As a general matter, we agree that preserving ballot integrity and preventing fraud in the initiative-circulation process may constitute significant state interests. Nevertheless, the Legislature may not simply incant these aims to shield its actions from judicial inquiry.
Here, we conclude that these legislative and administrative restrictions impermissibly burden the initiative-circulation process by (1) substantially reducing the size of the audience that the sponsor can reach and rendering it less likely that the sponsor can garner the necessary number of signatures, while (2) not passing muster under the requisite level of constitutional scrutiny, which requires the State to establish that its restrictions are necessary for ballot integrity. See Class Size, 827 So.2d at 962-64; Tax Relief, 386 So.2d at 566-67. These signature-revocation provisions substantially burden the constitutional rights of initiative proponents and initiative signatories[17] by affording initiative opponents an unopposed, definitive opportunity to "persuade" electors to revoke their signatures for any reason and by any means, even illegitimate. Further, electors who may change their minds concerning an executed revocationand initiative proponents who support such changes of heartare subject to potential criminal prosecution regarding efforts to re-sign the relevant initiative petition. See §§ 104.091, 104.185(1), Fla. Stat. (2007).
Signature-revocation campaigns are neither necessary nor appropriate to prevent or reduce alleged instances of fraud or forgery in the petition-circulation process. In fact, the provisions at issue in this case exhibit the potential to increase, rather than decrease, possible fraud by incentivizing a partisan race to "persuade" Florida's electors to revoke previously provided signatures. Such a practice stands in stark contrast to our rationale in Take Back Tampa, where we communicated that authentication efforts intended to preserve the integrity of the petition process should be conducted and supervised by neutral election officials rather than biased advocates. See Take Back Tampa, 625 So.2d at 844-45.

Alternative Means Already Exist to Address Alleged Forgery and Fraud in the Signature-Gathering Process
The State of Florida has already provided alternative mechanisms through which alleged fraud in the signature-gathering process may be discouraged, discovered, and remedied. For example, chapter 98, Florida Statutes (2007), creates a comprehensive system of voter-registration list maintenance to ensure that only eligible individuals remain registered as Florida electors and that, inter alia, deceased individuals, fictitious persons, mentally incapacitated persons, and convicted felons whose civil rights have not been restored are promptly removed from the statewide voter registration system. Similarly, section 99.097, Florida Statutes (2007), provides for neutral verification of initiative-petition signatures by the supervisors of elections, and section 100.371(3)(a)-(d), which is not affected by our decision today, states that supervisors of elections may only verify a signed initiative-petition form if the form contains(a) the elector's original signature, (b) the date on which the elector signed the form, and (c) the elector's name, street address, county, and voter-registration number or birth date *1072 and if, at the time of signing, (d) the elector was a qualified, registered elector.
To combat the risk of fraud or forgery, Florida's Election Code provides that it is a first-degree misdemeanor to sign an initiative-petition form using another person's name or a fictitious name and further provides that persons who aid, abet, or advise another concerning violation of the Code shall be punished as principals and that co-conspirators and confederates shall be punished as if they directly committed the relevant offense(s). See §§ 104.091, 104.185(2), Fla. Stat. (2007). To facilitate the investigation of such offenses, section 104.43 grants any qualified elector the right to request a special grand-jury investigation preceding any election to determine whether any provision of the Florida Election Code has been violated, and provides that if sufficient grounds exist, the grand jury may issue indictments.
In addition to the criminal offenses present in chapter 104, Florida Statutes (2007), Florida's general criminal law, which is equally applicable to fraud and forgery, provides that forgery of a public record with an intent to injure or defraud any person is a third-degree felony, and that knowingly making "a false statement in writing with the intent to mislead a public servant in the performance of his or her official duty" is a second-degree misdemeanor. § 837.06, Fla. Stat. (2007). With regard to prosecution and enforcement efforts: section 16.56(1)(a)12., Florida Statutes (2007), vests the Office of Statewide Prosecution with concurrent jurisdiction to investigate and prosecute any criminal offense "involving . . . issue petition activities"; section 106.25(1), Florida Statutes (2007), vests the Florida Elections Commission with concurrent authority to investigate violations of chapter 104; section 106.25(6) obligates the appropriate state attorney to investigate and, if necessary, prosecute complaints referred by the Florida Elections Commission; section 106.27(1), Florida Statutes (2007), provides that "[c]riminal proceedings for violations of . . . chapter 104 may be brought in the appropriate court of competent jurisdiction [and that] any such action . . . shall be advanced on the docket of the court . . . and put ahead of all other actions"; section 106.265, Florida Statutes (2007), provides civil penalties for violations of chapter 104; and section 106.27(2) provides for injunctive relief against violations of chapter 104.
Finally, the judicial branch provides at least two mechanisms that directly promote ballot integrity and the reduction of fraud. First, well before any referendum, this Court reviews ballot titles and summaries to ensure compliance with the single-subject limitation and to guarantee that Florida's electors are not misled "with regard to the true effect of a [proposed] amendment" or revision,[18] and such titles and summaries are the primary materials presented to an elector upon a request for his or her signature on an initiative-petition form. See art. IV, § 10, Fla. Const.; art. V, § 3(b)(10), Fla. Const.; §§ 15.21(3), 16.061(1), Fla. Stat. (2007); Fla. Admin. R. 1S-2.009(2)(d) (requiring that initiative-petition forms contain a "ballot title that shall not exceed 15 words and [a] ballot summary of the proposed amendment . . . that shall not exceed 75 words in length" (emphasis supplied)). No similar judicial review occurs concerning the revocation process at issue in this case. Second, forged and fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, section 3,[19] *1073 and we have held that "neither verification by the supervisors [of elections] nor certification by the secretary of state immunizes [an initiative] proposal from a judicial action claiming [that] the necessary constitutional requirements have not properly been met." Tax Relief, 386 So.2d at 567 (emphasis supplied). Thus, at a minimum, there is also a judicial mechanism through which initiative proposals that depend upon forgery or fraud may be excluded from the ballot. Moreover, nothing in our opinion today should be construed as affecting the presumably inherent right of Florida's electors to provide testimony and properly authenticated admissible evidence that their purported "signatures" were forged or procured through fraud. Cf. art. I, § 1, Fla. Const. ("All political power is inherent in the people. The enunciation herein of certain rights shall not be construed to deny or impair others retained by the people.").
Therefore, we hold that signature revocation is neither a neutral, nondiscriminatory regulation of petition-circulation and voting procedure, which is explicitly or implicitly contemplated by article XI, nor a process necessary for ballot integrity.

CONCLUSION
As more fully explained in our analysis, we affirm the decision of the First District Court of Appeal in Florida Hometown Democracy, Inc. v. Browning, 980 So.2d 547 (Fla. 1st DCA 2008), because the district court correctly concluded that signature revocation is neither contemplated by the self-executing plain text of article XI, nor is it necessary to ensure ballot integrity and a valid election process. Accordingly, the signature-revocation provisions provided in section 100.371, Florida Statutes (2007), and Florida Administrative Code Rules 1S-2.0091 and 1S-2.0095 violate the Florida Constitution and are void and without effect.
It is so ordered.
QUINCE, C.J., PARIENTE and LABARGA, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which QUINCE, C.J., and LABARGA, J., concur.
LEWIS, J., concurs in result only.
POLSTON, J., dissents with an opinion, in which CANADY, J., concurs.
PERRY, J., did not participate.
PARIENTE, J., specially concurring.
I concur in the majority's decision to affirm the First District's well-reasoned opinion in Florida Hometown Democracy, Inc. v. Browning, 980 So.2d 547 (Fla. 1st DCA 2008), holding unconstitutional the signature-revocation provisions of section 100.37, Florida Statutes (2007). The citizens have a specific state constitutional right to propose amendments through the initiative process as set forth in article XI, section 3. See art. XI, § 3, Fla. Const. ("The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people. . . ."). As the majority explains, our precedent is clear that the methods of amending our constitution
are delicately balanced to reflect the power of the people to propose amendments through the initiative process and the power of the legislature to propose amendments by its legislative action without executive check. Only these two methods can produce constitutional amendment proposals at each general election. . . . In considering any legislative act or administrative rule which *1074 concerns the initiative amending process, we must be careful that the legislative statute or implementing rule is necessary for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process. The delicate symmetric balance of this constitutional scheme must be maintained, and any legislative act regulating the process should be allowed only when necessary to ensure ballot integrity.
State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561, 566 (Fla.1980) (emphasis supplied). Thus, the Legislature does have the authority to pass legislation regarding the petition process but that authority is limited to legislation or regulations necessary to ensure ballot integrity. In addition, when necessary to ensure ballot integrity or a valid election process, any statute or regulation must be administered by neutral election officials. Whether a proposed constitutional amendment should be included in the Constitution is of course a subject for proponents and opponents to debate vigorously after the amendment is placed on the ballot.[20]
The signature-revocation legislation we are required to hold unconstitutional has almost nothing to do with ensuring ballot integrity. Rather, whether intended by the Legislature or not, the statutory scheme gives those opposing the initiative an unfair advantage before the amendment is even placed on the ballot by allowing those opponents to persuade voters who have already signed the petition to change their minds. Once a signature is revoked based on the opponents' campaign, there is no opportunity for the voter to re-sign the petition.
The statute, as drafted, is fraught with the potential for abuse of the signature-gathering process before the initiative is submitted to the voters. It may of course be true, as argued by appellees, that there are "virtues and benefits of signature revocation procedures." Fla. Hometown Democracy, 980 So.2d at 550. If that is the case, then the remedy lies in proposing a constitutional amendment to the citizen initiative process. However, as the First District concluded based on our controlling precedent, the signature-revocation legislation in this case is "not necessary for the orderly presentation of initiative-generated constitutional amendment proposals on general election ballots. Instead, [it] serve[s] to burden the initiative process with requirements that are not prescribed by the constitution. . . ." Id. I agree and, for all of these reasons, concur in the decision to find the signature-revocation legislation to be an unconstitutional intrusion on article XI, section 3.
QUINCE, C.J, and LABARGA, J., concur.
POLSTON, J., dissenting.
The plurality holds that the statutory provisions providing electors the opportunity to revoke their signatures on citizen initiative petitions violate article XI, section *1075 3 of the Florida Constitution. This is error. Based upon our well-established precedent interpreting the Florida Constitution, the statutory provisions do not violate article XI, section 3 because the provisions at issue are reasonable regulations necessary for ballot integrity. It is not unconstitutional for the Florida Legislature to allow electors to revoke their signatures when they may have been obtained by undue influence, intimidation, or fraud or when the electors have simply changed their minds after being persuaded on the merits otherwise. It is reasonable to empower electors with control over their own signatures so that they are not required to have their signatures on petitions counted against their will. The revocation statutes apply neutrally, without considering the merits of the proposed constitutional amendment.
The plurality's ruling that "the politically charged counter-petition revocation campaigns created by these provisions in operation . . . would essentially eviscerate and render meaningless the citizen-initiative process"[21] is unsupported by any trial court findings and unsupported by Florida law. Rather, this ruling is based entirely upon speculation. If the revocation efforts contributed to an initiative not getting on the ballot, would it be (i) because of the mere existence of the revocation process as suggested by the plurality; (ii) because of the initiative's lack of merit (causing electors to change their minds); or (iii) because of how the petition signatures were obtained (revocation because of fraud or undue influence in the initiative process)? Speculation on the answer does not support the plurality's ruling that the revocation statutes and rules are facially unconstitutional.[22] Contrary to the plurality's ruling, "politically charged counter-petition revocation campaigns" do not render the statutory provisions unconstitutional. Our Florida Constitution is not so fragile and delicate that it cannot withstand the rigorous political debate of its citizens as to whether someone should place their signature on a citizen initiative.
Accordingly, I respectfully dissent.

I. BACKGROUND
Plaintiff, Florida Hometown Democracy, Inc. PAC, is a Florida political committee, registered pursuant to chapter 106, Florida Statutes, to sponsor and advocate for the adoption of a proposed amendment to Florida's Constitution, titled "Referenda Required for Adoption and Amendment of Local Government Comprehensive Land Use Plans."[23] FHD sued defendants Kurt S. Browning, in his capacity as Secretary of State and head of the Department of State, the State of Florida, and the Department of State, Division of Elections (collectively referred to as the State) in the Circuit Court for the Second Circuit, in and for Leon County, for declaratory judgment and injunction relief. In Count I, FHD alleged that:
38. Article XI, Section 3, Florida Constitution, is a self-executing provision of the State Constitution, which provides the fundamental authority for citizens to amend the State Constitution by initiative. Neither Article XI, Section 3, *1076 Florida Constitution, nor any other provision of the State Constitution, provides for, or authorizes the Legislature to enact, a revocation process or authorize Defendants to adopt rules for a revocation process.
39. The statutory amendments Section 100.371, Florida Statutes, affected by Section 25 of Chapter 2007-30, Laws of Florida, and the emergency rules promulgated by the Defendant Department of State, Division of Elections, impede the constitutional right of initiative and are not authorized by Article XI, Section 3, Florida Constitution.
Accordingly, FHD sought a declaratory judgment stating that the statutory amendments and emergency rules are unconstitutional under article XI, section 3, Florida Constitution, and injunctive relief from their application to citizen initiative petitions.
The Florida Legislature specifically provided the following revocation provisions at issue within an extensive act relating to elections:
Section 25. Effective August 1, 2007, subsections (1) and (3) of section 100.371, Florida Statutes, are amended, present subsection (6) of that section is renumbered as subsection (7) and amended, and a new subsection (6) is added to that section, to read:
100.371 Initiatives; procedure for placement on ballot.
(1) Constitutional amendments proposed by initiative shall be placed on the ballot for the general election, provided the initiative petition has been filed with the Secretary of State no later than February 1 of the year the general election is held. A petition shall be deemed to be filed with the Secretary of State upon the date the secretary determines that valid and verified the petition forms have has been signed by the constitutionally required number and distribution of electors under this code, subject to the right of revocation established in this section.

(3) Each signature shall be dated when made and shall be valid for a period of 4 years following such date, provided all other requirements of law are met. The sponsor shall submit signed and dated forms to the appropriate supervisor of elections for verification as to the number of registered electors whose valid signatures appear thereon. The supervisor shall promptly verify the signatures within 30 days of receipt of the petition forms and upon payment of the fee required by s. 99.097. The supervisor shall promptly record each valid signature in the statewide voter registration system, in the manner prescribed by the Secretary of State, the date each form is received by the supervisor and the date the signature on the form is verified as valid. The supervisor may verify that the signature on a form is valid only if:

(a) The form contains the original signature of the purported elector.
(b) The purported elector has accurately recorded on the form the date on which he or she signed the form.
(c) The form accurately sets forth the purported elector's name, street address, county, and voter registration number or date of birth.
(d) The purported elector is, at the time he or she signs the form, a duly qualified and registered elector authorized to vote in the county in which his or her signature is submitted.
The supervisor shall retain the signature forms for at least 1 year following the election in which the issue appeared on the ballot or until the Division of Elections notifies the supervisors of elections that the committee which circulated the *1077 petition is no longer seeking to obtain ballot position.
(6)(a) An elector's signature on a petition form may be revoked within 150 days of the date on which he or she signed the petition form by submitting to the appropriate supervisor of elections a signed petition-revocation form adopted by rule for this purpose by the division.
(b) The petition-revocation form and the manner in which signatures are obtained, submitted, and verified shall be subject to the same relevant requirements and timeframes as the corresponding petition form and processes under this code and shall be approved by the Secretary of State before any signature on a petition-revocation form is obtained.
(c) Supervisors of elections shall provide petition-revocation forms to the public at all main and branch offices.
(d) The petition-revocation form shall be filed with the supervisor of elections by February 1 preceding the next general election or, if the initiative amendment is not certified for ballot position in that election, by February 1 preceding the next successive general election. The supervisor of elections shall promptly verify the signature on the petition-revocation form and process such revocation upon payment, in advance, of a fee of 10 cents or the actual cost of verifying such signature, whichever is less. The supervisor shall promptly record each valid and verified petition-revocation form in the statewide voter registration system in the manner prescribed by the Secretary of State.

(7) (6) The Department of State may adopt rules in accordance with s. 120.54 to carry out the provisions of subsections (1)-(6) (1)-(5).
Ch.2007-30, § 25, at 339-41, Laws of Fla.
In August 2007, the Division of Elections published the two emergency rules (rules 1SER07-1 and 1SER07-2), challenged by FHD, to immediately implement the revocation provisions set forth in section 25 of chapter 2007-30, Laws of Florida. The Division of Elections also published a "Notice of Development of Proposed Rules" regarding proposed rule 1S-2.0095, Florida Administrative Code, "Constitutional Amendment Petition Revocation" and proposed rule 1S-2.0091, Florida Administrative Code, "Constitutional Amendment Submission Deadline; Verifying Electors' Signatures." The proposed rules, which were identical to the emergency rules, became effective on October 15, 2007. Rule 1S-2.0095, Florida Administrative Code (2007), establishes the procedures for revocation sponsors to follow. The procedures mirror those for petition gatherers. Rule 1S-2.0091, Florida Administrative Code (2007), states that, on February 1 of the year in which the general election is held, verified revocations will be deducted from verified petition signatures to determine if the petition has the constitutionally required number of signatures for placement on the ballot.
The parties filed cross-motions for final summary judgment and a related stipulation of facts for the trial court's consideration. The parties stipulated to the identity of the parties, the Division of Elections' approval of FHD's initiative petition form, FHD's collection of a number of signatures, this Court's issuance of an advisory opinion about the proposed amendment, the Legislature's enactment of the revocation provisions, the Department of State's adoption of rules implementing the revocation provisions, and the Division of Elections' approval of a revocation petition submitted *1078 by Save Our Constitution, Inc. Upon hearing argument and reviewing these stipulated facts, the trial court granted summary judgment in favor of Browning. The trial court determined that the revocation provisions did not violate article XI, section 3 of the Florida Constitution or the due process and equal protection provisions of the United States and Florida Constitutions.
Specifically, the trial court order detailed the revocation provisions and analyzed article XI, section 3 of the Florida Constitution. The trial court accurately described the issue, stating: "The narrower question to be addressed by this Court is whether the Legislature may enact and the Defendants may implement the Revocation provisions to ensure ballot integrity." In concluding that the revocation provisions are constitutional under article XI, section 3, the trial court stated:
The Revocation Provisions do not place any additional requirement or burden on the elector who intends to sign a petition, or to vote on the initiative once it is placed on the ballot. The Revocation Provisions do in fact grant the elector more power over his signature and decision to support the placement of an initiative on the ballot. The Provisions do not change or add to the requirements set forth in Article XI, Section 3 of the Florida Constitution. Furthermore, the Revocation Provisions do not in any way strengthen the power of the Legislature vis-à-vis the people as prohibited in the decisional authority.
. . . The reasons for the correctness of a decision to allow a voter or elector to change their mind was best stated by the Supreme Court of North Carolina as follows:
It is supposed that second thoughts are apt to be sounder, and this conviction has led courts to consider the right of withdrawal favorably, both as a matter of justice to the individual, who is entitled to apply his best judgment to the matter at hand, and as sound policy in community and public affairs, where the establishment of governmental institutions should rest upon mature consideration rather than be mere unnecessary excrescences upon the body politic, raised by the whim and fancy of a few men. . . .
The facility with which signatures may be obtained to petitions is proverbial, and in other instances the amount and character of the persuasion is unknown. "What good reason is there why one who has changed his mind since signing a petition, and who concludes that either the public good or his own interest is not in harmony with the petition, may not recede from his signature before action taken thereon? The rule which permits a withdrawal at any time before final action upon the petition is much more likely to get at the real and mature judgment of the voters, and it is calculated to discourage a hasty presentation of a petition for signatures without a full disclosure of the real merits of the question. Circulators of the petition can usually avoid sufficient withdrawals to defeat the petition by taking care that the matter is fully understood by those to whom it is presented for signature." . . . And in considering the effect of the withdrawal upon other petitions we must remember that the defeat of an aspiration is not destruction of a right.

Idol v. Hanes, 219 N.C. 723, 14 S.E.2d 801, 802-803 (1941) (citations omitted).
Fla. Hometown Democracy, Inc. PAC v. Browning, No.2007-CA-2278, slip op. at 5-6 (Fla.2d Cir.Ct. Nov. 27, 2007) (emphasis *1079 added). I agree with the well-reasoned opinion of Judge Charles Francis.
FHD appealed the trial court's decision to the First District, which reversed the trial court and held that the revocation provisions violated article XI, section 3 of the Florida Constitution. Fla. Hometown Democracy, Inc., PAC v. Browning, 980 So.2d 547 (Fla. 1st DCA 2008). The First District reasoned that the provisions burden the process with regulations that are not provided for in the Florida Constitution and are also not necessary for the orderly presentation of initiative-generated proposals.
On appeal before this Court, Browning argues that the First District misconstrued this Court's decisions addressing ballot initiatives and, thereby, erred in holding that the revocation provisions violate article XI, section 3 of the Florida Constitution.

II. ANALYSIS
Article XI, section 3 of the Florida Constitution reserves to the people the right to propose revisions and amendments to the Florida Constitution via initiative petition:
Initiative.The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith. It may be invoked by filing with the custodian of state records a petition containing a copy of the proposed revision or amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.
As the text indicates, article XI, section 3 specifically addresses only four issues: (1) the power to propose revisions and amendments by initiative rests in the people; (2) the proposal must generally be limited to a single subject; (3) the petition must be filed with the Secretary of State; and (4) the petition must be signed by the appropriate number of electors.
"The legislative branch looks to the [Florida] Constitution not for sources of power but for limitations upon power." Fla. House of Representatives v. Crist, 999 So.2d 601, 611 (Fla.2008) (quoting State ex rel. Green v. Pearson, 153 Fla. 314, 14 So.2d 565, 567 (1943)), cert. denied, ___ U.S. ___, 129 S.Ct. 1526, 173 L.Ed.2d 657 (2009); see also Sun Ins. Office, Ltd. v. Clay, 133 So.2d 735, 742 (Fla.1961) ("Although the Federal Constitution bestows power only in specific grants and is a document of delegated powers, the Florida Constitution is a limitation on power as distinguished from a grant of power, particularly with regard to legislative power.") (quoting 6 Fla. Jur. Constitutional Law, § 37 (1956)).
Consistent with these well-established principles regarding our state constitution and legislative power, the Florida Legislature regulates the initiative process well beyond the four issues addressed in the text of article XI, section 3 to ensure ballot integrity and a valid election process. For example, section 101.161(1), Florida Statutes (2007), requires any initiative amendment to contain a ballot summary, which is not prescribed by article XI, section 3. The ballot summary must be limited to seventy-five words, prepared by the petition sponsor, and approved by the Secretary of State. This Court in Wadhams v. Board of County Commissioners of Sarasota County, 567 So.2d 414, 416 (Fla.1990), *1080 found the ballot summary to be mandatory and in Advisory Opinion to the Attorney General re Fish & Wildlife Conservation Commission, 705 So.2d 1351, 1355 (Fla. 1998), struck a petition from appearing on the ballot because it lacked the statutorily prescribed ballot summary.
Similarly, section 100.371(2), Florida Statutes (2007), contains several preconditions that are not expressly found in the Florida Constitution.[24] Furthermore, section 100.371(3), Florida Statutes (2007), prohibits the bundling of petitions together for the purposes of garnering signatures. Section 100.371(3) also mandates that the signature forms correspond to four statutorily prescribed requirements that are not expressly found in the Constitution.[25] Moreover, section 100.371(4), Florida Statutes (2007), requires petition signatures to be verified before they can be filed with the Secretary of State.
In summary, prior to the enactment of the revocation provisions at issue here, the Legislature regulated who may propose an amendment, the process of submitting the proposal, and the content of the proposal. These are specific requirements on the initiative process that are not prescribed by the Florida Constitution. And as evidenced by this Court's approval of these numerous regulations, lack of constitutional prescription is not a barrier to the Legislature's authority to regulate the citizen initiative process.[26]
More specifically, this Court has issued three opinions analyzing the Legislature's authority to regulate the citizen initiative process under article XI, section 3 of the Florida Constitution: State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla.1980); Krivanek v. Take Back Tampa Political Committee, 625 So.2d 840 (Fla.1993); and Smith v. Coalition to Reduce Class Size, 827 So.2d 959 (Fla.2002).
In Firestone, 386 So.2d at 567, this Court upheld the constitutionality of a statute requiring local supervisors of elections to verify signatures on initiative petitions. In so holding, this Court set forth the rule that we have employed in our subsequent citizen initiative decisions, a rule which recognizes the Legislature's duty and authority to enact reasonable regulations of the initiative process to ensure ballot integrity. Specifically, we stated:
The four methods of amending our constitution must be considered as a whole to effect their overall purpose. Smathers v. Smith, 338 So.2d 825 (Fla. 1976). They are delicately balanced to reflect the power of the people to propose *1081 amendments through the initiative process and the power of the legislature to propose amendments by its legislative action without executive check. . . . In considering any legislative act or administrative rule which concerns the initiative amending process, we must be careful that the legislative statute or implementing rule is necessary for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process. The delicate symmetric balance of this constitutional scheme must be maintained, and any legislative act regulating the process should be allowed only when necessary to ensure ballot integrity. We do, however, recognize that the legislature, in its legislative capacity, and the secretary of state, in his executive capacity, have the duty and obligation to ensure ballot integrity and a valid election process. Ballot integrity is necessary to ensure the effectiveness of the constitutionally provided initiative process.

Firestone, 386 So.2d at 566-67 (emphasis added). Further, this Court in Firestone explained that "verification is essential to ballot integrity and the legislature and the secretary may prescribe reasonable regulations to ensure an expeditious and proper verification process." Id. at 567 (emphasis added).
In Krivanek, 625 So.2d 840, this Court decided the constitutional validity of a Division of Elections opinion interpreting section 98.081, Florida Statutes (1991), which required the local supervisors of elections to update their voter registration rolls during each odd-numbered year. More specifically, the statute required the supervisors to mail an information card to registered voters who had not voted in the prior two years. See Krivanek, 625 So.2d at 841-42. Thereafter, the registered voter had thirty days to return the information card and, if the voter did not return the card within that time, the voter was temporarily removed from the registration books. Id. If the voter did not return the card within three years or did not re-register during that time, the voter was removed from the registration books altogether. Id. This Court explained that "[t]he purpose of these provisions is to assure that voters who have not voted in the last two years are still alive and still reside at the localities indicated on the voter registration rolls." Id. at 842.
The Division of Elections issued an advisory opinion, which interpreted section 98.081 and determined that any voter who had been temporarily removed from the registration books was ineligible to participate in the initiative process. Id. at 843. Thus, an elector who had been temporarily removed could not validly sign an initiative petition until his or her registration became current. Id.
This Court concluded that the statute and subsequent Division advisory opinion did not violate article XI, section 3 of the Florida Constitution. Id. at 845. We held that the temporary removal of electors from the registration books and their corresponding inability to participate in the citizen initiative process prevented fraud and was "necessary to preserve ballot integrity and a valid election process." Id. at 844. This Court stated, "We do not find the interpretation rendered by the Division of Elections to be unreasonable or unduly burdensome." Id.
In reaching this holding, this Court repeated the rule from Firestone that reasonable regulations of the initiative process to ensure ballot integrity are not prohibited. However, in Krivanek, this Court added to the rule promulgated in Firestone by explicitly explaining that reasonable *1082 regulations that prevent fraud are necessary to preserve ballot integrity and a valid election process. Specifically, this Court stated:
Given its constitutional underpinnings, the right to petition is inherent and absolute. This does not mean, however, that such a right is not subject to reasonable regulation. Quite the contrary, reasonable regulations on the right to vote and on the petition process are necessary to ensure ballot integrity and a valid election process. See, e.g., State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla. 1980) (legislature and secretary of state may impose reasonable regulations on process of petition validation to ensure expeditious and proper verification of petition signatures). Section 98.081's requirements are an example of such reasonable regulations.
Id. at 843 (emphasis added). This Court then continued:

The prevention of fraud . . . [is] necessary to preserve ballot integrity and a valid election process. Consequently, we find that the minimal burden of either voting at least once every two years or notifying the supervisor in writing that one's status as a qualified elector has not changed is reasonable.

Id. at 844 (emphasis added); see also Crawford v. Marion County Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (upholding state statute requiring a government-issued photo identification in order to vote and explaining that Indiana had a sufficient interest to deter and prevent fraud even if the identification regulation burdened some voters).
Relying on Krivanek, the plurality erroneously suggests that regulations of the initiative process must be conducted by neutral election officials in order to be constitutional. See e.g., plurality op. at 1058 ("[A]uthentication efforts intended to preserve the integrity of the petition process should be conducted and supervised by neutral election officials rather than biased advocates."); see also specially concurring op. at 1074 ("[W]hen necessary to ensure ballot integrity or a valid election process, any statute or regulation must be administered by neutral election officials."). But when this Court discussed neutral election officials in Krivanek, this Court was construing a statute that expressly required action by neutral election officials. See Krivanek, 625 So.2d at 845 ("The statute requires an affirmative act of notification by a temporarily removed elector to a neutral election official before the elector can vote."). Therefore, Krivanek does not support the plurality's generalized conclusion that regulations of the initiative process must be administered by neutral election officials to pass constitutional muster.
In Smith, 827 So.2d at 960, this Court held that a statute requiring financial impact statements to appear on the ballot after summaries of the initiatives violated the Florida Constitution. However, in Smith, this Court again repeated and applied the rule from Firestone that is quoted above. See Smith, 827 So.2d at 963 ("Pursuant to the standard announced in this Court's opinion in [Firestone], `[i]n considering any legislative act or administrative rule which concerns the initiative amending process, we must be careful that the legislative statute or implementing rule is necessary for ballot integrity.' 386 So.2d at 566. Therefore, in the instant case, the Court must decide whether chapter 2002-390 is necessary to ensure ballot integrity. The circuit court concluded below that it was not. We agree.") (footnote omitted).
Accordingly, this Court's ballot initiative decisions have all held that reasonable regulations *1083 of the citizen initiative process do not violate article XI, section 3 of the Florida Constitution if the regulations are necessary to ensure ballot integrity, including the prevention of fraud. And, under our decisions in Firestone, Krivanek, and Smith, the revocation provisions at issue here are reasonable regulations necessary to ensure ballot integrity; therefore, they are constitutional.
Here, the primary purpose of the revocation provisions is to prevent fraud and offer the electors an avenue to rectify any misrepresentation that occurred during the petition gathering process. The regulations here specifically address a type of fraud that the current regulations do not account for. In particular, the regulations address fraud in the inducement of the signature and fraud in the actual signing.[27] Consequently, the revocation provisions serve to prevent fraud during the petition initiative process and are, therefore, necessary for ballot integrity. See Krivanek, 625 So.2d at 844 ("The prevention of fraud. . . [is] necessary to preserve ballot integrity and a valid election process.").
There are numerous examples of fraudulent practices on the part of initiative proponents. For example, the First District heard a case in 2006 in which the initiative proponent admitted "it presented petitions that contained forged and fictitious names to fraudulently create the illusion that it had complied with the mandatory constitutional prerequisites." Floridians Against Expanded Gambling v. Floridians for a Level Playing Field, 945 So.2d 553, 561 (Fla. 1st DCA 2006) (explaining that fraud in the gathering of petitions is not a minor or technical defect but one that requires an initiative to be declared invalid if proven). Moreover, the Senate Staff Analysis for Committee Substitute for Senate Bill 900, in which the language at issue originated, cited a report from Santa Rosa County in which two signature gatherers were charged with over forty counts each of forging documents as well as an FDLE investigation into voter fraud of those tasked with gathering signatures. Fla. S. Comm. on Judiciary, CS for SB 900 (2007) Staff Analysis 1 (Apr. 18, 2007) (on file with Comm.).
The plurality concludes that there is no need for the revocation statutes because signatures obtained fraudulently may be set aside by litigation, relying on Floridians Against Expanded Gambling, 945 So.2d at 561-62 (explaining that forged and fraudulent signatures may not be used to satisfy the mandatory signature requirements of article XI, section 3). However, it is a very different undertaking for an elector to initiate or join a lawsuit to set aside a signature than to simply sign a form. Litigation is by nature adversarial, likely costly, and unfortunately will probably take a long time. For example, the lawsuit in Floridians Against Expanded Gambling is ongoing on remand from the First District. To set aside a simple legislative process that is quick and efficient and, instead, place reliance on the judicial process to remedy fraudulently obtained signatures is misplaced.
In addition to ensuring ballot integrity by preventing fraud, the revocation provisions ensure ballot integrity by empowering the elector with full control over his signature. Enabling an elector to maintain control over his signature ensures that the proposed amendment has the constitutionally *1084 required level of support and accurately reflects the will of the electors.
As set forth in Firestone, Krivanek, and Smith, the Legislature may prescribe reasonable regulations on the citizen initiative process to ensure ballot integrity. Here, several factors contribute to the reasonableness of the revocation provisions. First, the revocation provisions and the rules implementing them are identical to those for the petition gathering process.[28] Stated otherwise, the regulations on initiative opponents seeking revocations parallel the regulations on petition sponsors. Section 100.371(6)(b), Florida Statutes (2007), makes clear that the party seeking revocations must abide by the "same relevant requirements and timeframes as the corresponding petition form and processes." Prior to the enactment of the revocation provisions, petition sponsors were required to register as a political committee.[29] The revocation provisions do not alter that requirement or make an already political process somehow more political by requiring the revocation proponents to play by the same rules as the petition gatherers.
Second, the revocation provisions give both parties, petition proponents seeking signatures and petition opponents seeking revocations, the same number of opportunities at obtaining a signature. By enacting rules and regulations that are the same for both the petition gatherers and the revocation sponsors, the Legislature has ensured that both parties have equal opportunities while granting the elector more control over his signature. Prior to the enactment of the revocation provisions, an elector signing a petition was bound by that signature for a period of four years.[30] The practical effect of the revocation provisions is to allow an elector to sign a petition once and a revocation once. Therefore, the revocation provisions provide the elector more control over his or her signature and also do not take away the ability of petition sponsors to gather signatures.
Third, the process is time-certain, thereby ensuring that all revocations are complete and submitted by the same date that signatures must be filed with the Secretary of State. The revocation process is limited in duration so as to coincide with the Secretary of State's already existing timeline for the submission of signed petitions for placement on the ballot. Subsection 6(a) of the revocation provisions requires all signature revocations to be signed within 150 days of the original petition form signing. While an elector has 150 days to revoke, a sponsor may hold signatures for validation well beyond that period up to four years. Moreover, the revocations must be filed with the Secretary of State by February 1, which is identical to the requirement for petition sponsors. Then, after the revocations are deducted from the validly signed petitions, the Secretary can make a determination of whether the sponsor satisfied the constitutionally required level of support.[31] These *1085 regulations establish reasonable timeframes in which the revocation process is to operate.
Fourth, the regulations are reasonable when compared to those from Firestone and Krivanek. In Firestone, the regulations required local supervisors of elections to verify every signature on a petition form, thus drastically increasing the supervisors' workload, yet this Court said it was reasonable. Similarly, in Krivanek, the regulations were deemed reasonable even though 462 petition signatures were voided, keeping an initiative from appearing on the ballot. The regulations here give more power to the elector and do not radically increase the workload or void signatures from petitions without the elector's consent. Thus, the regulations here are no less reasonable than those upheld in Firestone or Krivanek.
Fifth, the revocation provisions are reasonable because they do not overburden or undermine the citizen initiative process. It is undisputed that the constitution reserves the power to propose amendments via the initiative process to the people. See art. XI, § 3, Fla. Const. This Court in Firestone, 386 So.2d at 566 (emphasis added), stated that "we must be careful that the legislative statute or implementing rule is necessary for ballot integrity since any restriction on the initiative process would strengthen the authority and power of the legislature and weaken the power of the initiative process." Plainly, it was the restricting and weakening of the initiative process that this Court was concerned with. It is also well settled that the Legislature may act in any area that is not prohibited by or in conflict with the constitution. See Metro. Dade County v. Bridges, 402 So.2d 411, 413-14 (Fla.1981). Here, there has been no evidence presented showing that the revocation provisions infringe upon or conflict with the right of the people to propose an amendment to the constitution. Therefore, the Legislature is not prohibited from enacting the revocation provisions.
In this case, as the trial court accurately noted, the revocation provisions do not impose new restrictions on petition gatherers, nor do they impose new restrictions on the proponents of an amendment. Furthermore, they do not impede the signors of petitions in any way or strengthen the power of the Legislature vis-à-vis the people. To the contrary, the revocation provisions provide individual electors with more control and more power over their signatures. Granting an elector the right to revoke his signature within a specified timeframe does not lessen the elector's power. The provisions at issue here place the power in the hands of the people, whereas, prior to their enactment, an elector had no authority over his signature once a petition was signed.[32]
It is also important to recognize that the constitution does not guarantee a spot on the ballot to anyone who proposes an amendment. The only constitutional guarantee is the right to propose amendments. The revocation provisions do not mandate that an elector must revoke his signature, nor do the provisions impose new restrictions on the process of proposing amendments. Consequently, the revocation provisions are reasonable and do not infringe upon the constitutional guarantee that one has the right to propose amendments.
Accordingly, when analyzed under our well-established precedent interpreting the Florida Constitution, the revocation provisions at issue do not violate article XI, section 3. Rather, the regulations are reasonable *1086 and necessary for ballot integrity. They prevent fraudulent practices by petition proponents. They also empower, rather than inhibit, the people's constitutional right to propose an amendment through the initiative process. And, importantly, the revocation provisions are not prohibited by, or in conflict with, the Florida Constitution.

III. CONCLUSION
The plurality opinion misapplies this Court's precedent relating to article XI, section 3 of the Florida Constitution. Based upon a proper application of our precedent, the revocation provisions do not violate article XI, section 3 because they are reasonable regulations necessary for ballot integrity. It is reasonable for the opponents seeking revocation to be governed by regulations that are essentially the same as those that govern initiative petition sponsors. Further, the revocation provisions are necessary for ballot integrity because they allow electors to revoke their signatures when those signatures have been obtained by undue influence, intimidation, or fraud or when the electors have changed their minds.
The fact that the revocation process is political does not make it unconstitutional. The citizen initiative process is itself inherently political.
Therefore, I respectfully dissent.
CANADY, J., concurs.
NOTES
[1] Article XI, section 3, which we have repeatedly held to be self-executing, provides:

The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith. It may be invoked by filing with the custodian of state records a petition containing a copy of the proposed revision or amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.
(Emphasis supplied.)
[2] "The supreme court ... [s]hall hear appeals from ... decisions of district courts of appeal declaring invalid a state statute or a provision of the state constitution." Art. V, § 3(b)(1), Fla. Const.
[3] This mirrors the timeframe provided in section 100.371(6)(a), Florida Statutes (2007).
[4] See Black's Law Dictionary 732 (9th ed.2009) ("fraud in the factum. Fraud occurring when a legal instrument as actually executed differs from the one intended for execution by the person who executes it, or when the instrument may have had no legal existence."); Id. ("fraud in the inducement. Fraud occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved.").
[5] See Black's Law Dictionary 1435 (9th ed.2009) ("revocation, n. 1. An annulment, cancellation, or reversal, usu[ally] of an act or power.").
[6] FHD, a non-profit corporation established under chapter 617, Florida Statutes (2007), and a political action committee registered pursuant to section 106.03, Florida Statutes (2007), has been actively engaged in gathering elector signatures for an initiative proposal entitled "Referenda Required for Adoption and Amendment of Local Government Comprehensive Land Use Plans," which would provide Florida's voters a direct voice in the review and approval of their local governments' comprehensive land-use plans. We previously provided an opinion to the Attorney General pursuant to article V, section 3(b)(10) of the Florida Constitution advising him that this initiative proposal's ballot title and summary comply with the single-subject requirement of article XI, section 3, and the implicit accuracy requirement of article XI, section 5, codified at section 101.161(1), Florida Statutes (2006). See Advisory Op. to Att'y Gen. re Referenda Required for Adoption & Amendment of Local Gov't Comp. Land Use Plans, 938 So.2d 501, 503-06 (Fla.2006); see also Armstrong v. Harris, 773 So.2d 7, 11 (Fla.2000). FHD's initiative proposal thus possesses a logical oneness of purpose, does not engage in logrolling, does not substantially alter or perform the functions of multiple branches of government, and explains the proposed constitutional amendment's chief purpose in an accurate and informative manner through the use of "clear and unambiguous language." See Land Use Plans, 938 So.2d at 503-06.
[7] During oral argument, counsel for Secretary Browning and counsel for FHD agreed that FHD's initiative proposal is the only proposal currently targeted by a revocation campaign. If signature-revocation campaigns are merely intended as a "neutral," "empowering," and "necessary" means of ensuring the authenticity and accuracy of the initiative process, then the Legislature's decision to subject the effectiveness of such an authentication method to the vagaries and partisan advocacy of initiative opponents is all the more curious and questionable.
[8] Cf. generally The Federalist No. 51 (James Madison) (discussing separation of powers among branches of government).
[9] "The requirements for exercising this power are set forth in article XI, section 3. If these requirements are met, then the sponsor of an initiative has the right to place the initiative on the ballot." Class Size, 827 So.2d at 963; see also id. at 962; Tax Relief, 386 So.2d at 566.
[10] See Class Size, 827 So.2d at 962.
[11] At the time of our decision in Tax Relief, article XI, section 3 identified "the secretary of state" as the party receiving the petition. See Tax Relief, 386 So.2d at 563. Thereafter, during the 1998 general election, article XI, section 3 was amended to replace "secretary of state" with "custodian of state records."
[12] See § 98.081, Fla. Stat. (1991). Such programs ensure that only eligible individuals remain registered as Florida electors by, for example, promptly removing from the voter-registration list deceased individuals, fictitious persons, mentally incapacitated persons, and convicted felons whose civil rights have not been restored. See generally ch. 98, Fla. Stat. (2007).
[13] Constitutional provisions may include express and implied mandates:

The object of constitutional construction is to ascertain and effectuate the intention and purpose of the people in adopting it. That intention and purpose is the "spirit" of the Constitutionas obligatory as its written word. That spirit . . . must be found in those implications and intendments which clearly flow from the express mandates of the Constitution when considered in the light of circumstances and historical events leading up to its adoption, from all of which the purpose of the people in adopting it is to be gleaned.
Cobb, 58 So.2d at 178-79 (quoting Amos v. Mathews, 99 Fla. 1, 65, 115, 126 So. 308, 316 (1930)).
[14] E.g., signature revocation or financial-impact statements prior to the subsequent addition of article XI, section 5(c). Since signature revocation is entirely foreign to article XI, a severability analysis of this statutory and administrative scheme would be completely inapposite and inappropriate. The Legislature has attempted to substantively alter a constitutional check and balance on its power through a statute and, in such a context, it is not owed judicial deference, great or otherwise. See, e.g., Tax Relief, 386 So.2d at 566 ("The delicate symmetric balance of this constitutional scheme must be maintained, and any legislative act regulating the process should be allowed only when necessary to ensure ballot integrity." (emphasis supplied)); Cobb, 58 So.2d at 174 ("The Constitution is the charter of our liberties. It cannot be changed, modified or amended by [governmental] fiat. It provides within itself the only method for its amendment."). Moreover, the only portions of section 100.371, Florida Statutes, that our decision holds unconstitutional are those involving signature revocation. Hence, we have already severed these unconstitutional provisions from the remainder of the statute, and the dissent's request for a severability analysis is a total red herring. See dissenting op. at 1074-75.
[15] See, e.g., Merriam Webster's Collegiate Dictionary 776 (10th ed.1996) (defining "necessary" as "an indispensible item: ESSENTIAL").
[16] "A petition shall be deemed . . . filed with the Secretary of State upon the date the secretary determines that valid and verified petition forms have been signed by the constitutionally required number and distribution of electors under this code, subject to the right of revocation established in this section." § 100.371(1), Fla. Stat. (2007) (emphasis supplied). The circuit court, the Secretary, and our dissenting colleagues' reliance on extrajurisdictional precedent and Florida precedent that is unrelated to article XI's self-executing constitutional provisions is totally misplaced. See, e.g., Town of Gulf Shores v. Coggin, 269 Ala. 233, 112 So.2d 793 (1959) (addressing a statutory right to dissolve an Alabama municipal corporation); Volusia County v. Eubank, 151 So.2d 37 (Fla. 1st DCA 1963) (addressing a petition to relocate a county seat pursuant to chapter 138, Florida Statutes, and applying an arbitrary-and-capricious standard of review); Idol v. Hanes, 219 N.C. 723, 14 S.E.2d 801 (1941) (decision did not involve a constitutional right to petition concerning proposed constitutional amendments; rather, the decision involved a statutory right to petition followed by action from a board of county commissioners); In re Initiative Petition No. 2, City of Chandler, 170 Okla. 507, 41 P.2d 101 (1935) (dealing with a statutory right to petition to revoke a city charter); Lynn v. Supple, 166 Ohio St. 154, 140 N.E.2d 555 (1957) (addressing a statutory right of revocation concerning municipal ordinances); Halgren v. Welling, 91 Utah 16, 63 P.2d 550 (1936) (addressing a statutory petition scheme concerning state legislation). Due to this very serious analytical flaw, which totally overlooks the bulk of our controlling precedent, the circuit court's analysis was not complete or "well-reasoned" as the dissent asserts. Dissenting op. at 1078-79.
[17] See art. I, §§ 4-5, Fla. Const.; art. XI, § 3, Fla. Const.
[18] Fla. Dep't of State v. Slough, 992 So.2d 142, 147 (Fla.2008) (citing Armstrong, 773 So.2d at 16).
[19] See Expanded Gambling, 945 So.2d at 561-62.
[20] This Court's authority regarding constitutional amendments proposed by our citizens is likewise very narrowly limited to whether the amendment meets the single subject and ballot summary requirements. Whether this Court agrees with the "merits or wisdom" of any particular proposal is irrelevant to whether the proposal may be placed on the ballot. See, e.g., Advisory Op. to the Att'y Gen. re Limiting Cruel and Inhumane Confinement of Pigs During Pregnancy, 815 So.2d 597, 600 (Fla.2002) (Pariente, J., concurring). While I have questioned the proliferation of constitutional amendments in the past, I have also recognized that the Court has no authority to act in this arena to circumscribe the right of the citizens to amend their Constitution. See id.
[21] Plurality op. at 1057.
[22] The plurality also errs by not even attempting to apply a severability test as required by well-settled Florida law. See Ray v. Mortham, 742 So.2d 1276, 1280-81 (Fla.1999) (discussing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions).
[23] Plaintiff Lesley G. Blackner is the president and chair of Florida Hometown Democracy, and they are together collectively referred to as FHD herein.
[24] The petition sponsor must register as a political committee; the petition sponsor must submit the text of the amendment to the Secretary of State with the form on which the signatures will be affixed; and the Secretary must approve the petition form. § 100.371(2), Fla. Stat. (2007).
[25] Section 100.371(3) provides:

The supervisor may verify that the signature on a form is valid only if:
(a) The form contains the original signature of the purported elector.
(b) The purported elector has accurately recorded on the form the date on which he or she signed the form.
(c) The form accurately sets forth the purported elector's name, street address, county, and voter registration number or date of birth.
(d) The purported elector is, at the time he or she signs the form, a duly qualified and registered elector authorized to vote in the county in which his or her signature is submitted.
[26] This Court upheld the verification requirement, stating that "[n]othing is said in the constitution concerning verification." State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561, 566 (1980).
[27] The verification provisions upheld in Firestone ensure that the elector is actually registered and authorized to sign a petition, and the regulations upheld in Krivanek ensure that the voter registration rolls accurately reflect those residing in the county. However, neither addresses fraud in the inducement or fraud in the actual signing.
[28] Section 100.371(6)(b), Florida Statutes (2007), provides that "[t]he petition-revocation form and the manner in which signatures are obtained, submitted, and verified shall be subject to the same relevant requirements and timeframes as the corresponding petition form and processes."
[29] Section 100.371(2), Florida Statutes (2007), provides that "[t]he sponsor of an initiative amendment shall, prior to obtaining any signatures, register as a political committee."
[30] Section 100.371(3), Florida Statutes (2007), provides that "[e]ach signature shall be dated when made and shall be valid for a period of 4 years following such date."
[31] This Court in Krivanek, 625 So.2d at 844-45, found it reasonable to deduct signatures from the total amount even after the petitions were submitted.
[32] Section 100.371(3), Florida Statutes (2007), provides that "[e]ach signature shall be dated when made and shall be valid for a period of 4 years following such date."